THE MERCANTILE TRUST COMPANY OF ILLINOIS, Plaintiff in Error, *vs.* E. H. KASTOR, Defendant in Error.

*Opinion filed February 16, 1916—Rehearing denied April 12, 1916.*

1. CONTRACTS—*test in determining whether transaction was a sale or a loan.* The test in determining whether the real transaction between the parties to a contract was a sale or a loan is the intention of the parties, and that intention is to be ascertained from the whole transaction, including the conduct of the parties as well as their written agreement.

2. SAME—*statute against usury is not defeated by mere form of transaction.* If it appears from the entire contract between a mercantile company and another corporation that the real purpose is to pledge the open accounts of the mercantile company as security for a loan from the other corporation at usurious interest, the fact that the transaction was called a sale of the accounts will not avail to defeat the statute against usury.

3. CORPORATIONS—*corporation cannot be organized under the general Corporations act to loan money.* No corporation can be formed in Illinois, under the general Corporations act, for the business of loaning money, and if any power of a corporation so formed to loan money can be implied, it can only be where the

loan is incidental to the exercise by the corporation of some express power conferred by its charter.

4. SAME—*if contract is wholly beyond the power of a corporation it is void.* If a contract by a corporation is wholly beyond its power it is *ultra vires* in the proper sense and is void and no action can be maintained upon it by either party, nor can the other party be estopped to deny the validity of the contract by having received its benefits.

.5. SAME—*remedy of a corporation which has loaned money on an ultra vires contract.* If a corporation has loaned money on a contract which is *ultra vires* and void as beyond its power, it can not recover on the contract or against a guarantor of the contract, but its remedy, if any, is on the implied contract of the borrower to return the money received.

FARMER, C. J., and DUNCAN, J., dissenting.

WRIT OF ERROR to the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Municipal Court of Chicago; the Hon. JOSEPH SABATH, Judge, presiding.

RINGER, WILHARTZ, LOUER & CONCANNON, for plaintiff in error.

HARRIS F. WILLIAMS, (ATWOOD, PEASE & LOUCKS, ELDON M. VOTAW, and W. SCOTT HODGES, of counsel,) for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error recovered against the defendant in error, in the municipal court of Chicago, a judgment for $3140.12, which the Appellate Court for the First District reversed without remanding the cause, and by writ of *certiorari* the record has been brought to this court for review.

The plaintiff in error, the Mercantile Trust Company of Illinois, an Illinois corporation, and the United States Kellastone Company, an Oklahoma corporation, on September 2, 1913, entered into a written agreement the material parts of which are as follows, the Kellastone Company being des-

ignated the first party and the trust company the second party:

"*Whereas,* first party is desirous of selling to second party, contracts, accounts receivable and choses in action, hereinafter designated as accounts, evidencing shipments of personal property; now, therefore, in consideration of the premises the parties agree as follows:

"*First*—Second party agrees to buy the accounts belonging to first party which are acceptable to it, and to pay therefor ninety-nine per cent of the face value thereof on accounts that are paid within fifteen days from date of purchase by second party, and ninety-eight per cent of the face value thereof on accounts that are paid within thirty days from date of purchase by second party, and for each thirty days thereafter that said accounts are not paid the purchase price shall be reduced one per cent. Payment to be made by second party as follows: Seventy-seven per cent of the face value thereof upon acceptance by second party, the remainder, less all deductions, to be paid to first party immediately upon payment of any such accounts to second party; provided, however, that if at the time of any settlement between the parties hereto any of the accounts purchased hereunder shall be in default, payment of such remainder while any of the accounts are in default shall be discretionary with second party.

"*Second*—The term 'default' or 'loss,' as used in this contract, is construed to mean the non-payment of an account to second party at maturity, insolvency of the debtor, failure or refusal of a debtor to accept, receive or retain the property evidenced by such account. First party agrees to pay to second party all expenses, attorney's fees and losses incurred by second party in and about any account in default.

"*Third*—It is agreed that contemporaneously with the purchase of accounts first party shall assign and set over to second party such accounts purchased by it, to the end that second party shall be and become subrogated to all of the rights possessed by first party in respect thereto. Second party shall have the right to endorse the name of first party on all evidences of shipment or payment pertaining to accounts purchased hereunder. First party shall make entries upon its books disclosing the sale to second party of accounts purchased hereunder, and all records pertaining thereto shall at all times be open to the inspection of the second party.

"*Fourth*—It is expressly understood that the purchase of accounts by the second party is made upon representations in writing concerning the financial responsibility of the first party, state-

ments of which are to be furnished the second party once every calendar year.

"*Fifth*—First party is hereby given the right to make collections of accounts purchased by second party, and to that extent first party shall act as the agent of second party. The agency hereby created may be terminated by either party upon written notice. During this agency first party agrees to transmit and deliver to second party at its offices in Chicago, Illinois, on the day of receipt thereof, all evidences of payment of accounts purchased hereunder, in the original form received.

"*Sixth*—This agreement and all its provisions shall inure to and become binding upon the heirs, executors, administrators, successors and assigns of the parties hereto."

The following writing was indorsed on this agreement and signed by E. H. Kastor, the defendant in error, and two others, the three being stockholders in the Kellastone Company:

"In consideration of the sum of one ($1.00) dollar and other valuable considerations paid by Mercantile Trust Company of Illinois to each of the undersigned, receipt of which is hereby acknowledged, they and each of them do hereby jointly and severally guarantee to Mercantile Trust Company of Illinois, its successors or assigns, the full, prompt and faithful payment, performance and discharge by United States Kellastone Company of each of the provisions and conditions of the agreement on reverse side hereof, or any other instrument given or executed in pursuance thereof.

"The undersigned hereby jointly and severally waive all notice of default by first party, and waive notice of acceptance of this guaranty by Mercantile Trust Company of Illinois, its successors or assigns."

The plaintiff's statement of claim was for $5000 due the plaintiff from Kastor as guarantor of the contract between the United States Kellastone Company and the plaintiff, under which the Kellastone Company assigned and sold to the plaintiff accounts which remain unpaid by the debtors and which the Kellastone Company has failed to re-pay pursuant to the terms of the agreement, after due demand, wherefore the defendant, as guarantor, is liable to pay the amount of said accounts to the plaintiff. The accounts were stated to be for merchandise sold by the Kellastone

Company on the dates, to the persons, for the amounts and on terms of payment as follows:

| | | | | |
|---|---|---|---|---|
| H. A. Jones..............July | 26, 1913 | $1240.50 | 60 days. |
| H. A. Jones.............. Aug. | 28, " | 885.00 | 30 " |
| J. O. Davis.............. Aug. | 27, " | 708.07 | 30 " |
| Wolverine Bldg. and Supply Co. ................ Aug. | 21, " | 810.00 | 30 " |
| Wolverine Bldg. and Supply Co. ................ Sept. | 2, " | 640.00 | 30 " |
| Wolverine Bldg. and Supply Co. ................ Sept. | 4, " | 637.50 | 30 " |

Credit was given for various items of cash, amounting to $510.75, leaving an amount due of $4410.32. Suit was begun on October 8, 1913. The assignment of accounts was by means of a written instrument called a certificate of indebtedness, in the following form:

"This is to certify that the persons named below are indebted to the undersigned for merchandise sold and delivered in the sums set opposite their respective names:

| Date of Bill | Debtor | Address | Amount | Terms |
|---|---|---|---|---|
| 7 18 | W. L. Macatee & Son, car 25844 | Houston, Tex. | $920.00 | 60 days |
| 7 25 | W. L. Macatee & Son, car 19088 | Houston, Tex. | 1,080.00 | 60 days |
| 7 26 | H. A. Jones, car 62651 | Los Angeles, Cal. | 1,240.50 | 60 days |
| 8 6 | W. L. Macatee & Son, car 4092 | Houston, Tex. | 920.00 | 60 days |
| 8 7 | Jos. T. Blair, car 14015 | Cincinnati, O. | 810.00 | 30 days |
| 8 21 | Wolverine Bldg. & Supply Co., car 95868 | Detroit, Mich. | 810.00 | 30 days |
| 8 22 | N. A. Richards, car 46258 | Mobile, Ala. | 885.00 | 30 days |
| 8 23 | Beckman Supply Co., car 151173 | Hammond, Ind. · | 405.00 | 30 days |
| 8 23 | N. A. Richards, car 91780 | Mobile, Ala. | 810.00 | 30 days |
| 8 26 | C. H. Wolfert, car 25596 | Toledo, O. | 697.50 | 30 days |
| 8 28 | H. A. Jones, car 96551 | Los Angeles, Cal. | 885.00 | 30 days |
| 8 28 | E. L. Higdon, car 515218 | Birmingham, Ala. | 810.00 | 30 days |
| 8 30 | R. J. Mathis, car 57899 | Springfield, Ill. | 555.00 | 30 days |
| 8 30 | W. M. Brown, car 35898 | Milwaukee, Wis. | 540.00 | 30 days |
| | | | $11,318.00 | |

"CHICAGO, ILL., *Sept. 2, 1913.*

"For and in consideration of the sum of one dollar ($1.00) and other good and valuable considerations to the undersigned in hand paid, the receipt whereof is hereby acknowledged, the undersigned hereby sells, assigns and transfers to Mercantile Trust Company of Illinois, a corporation, its successors or assigns, all its right, title and interest in and to the contracts and open accounts above named, together with the merchandise represented thereby, and including the right of stoppage in transitu. The invoices, which amount to eleven thousand three hundred eighteen and no/100

dollars, ($11,318,) are herewith delivered to Mercantile Trust Company of Illinois. The undersigned guarantees that the moneys due on said contracts and open accounts are correctly set forth in above schedule; that full deliveries have been made on all said, contracts and open accounts in accordance with the specifications of the buyer; that there is no contra account against any of them; that the amounts due on said contracts and open accounts as set out in said schedules are not disputed by the debtor and are not past due; that there are no offsets against said accounts, or any of them, for freight, drayage or other carrying charges, commissions, damages, or any other counter claims of any nature whatsoever; that the amount set out in each item of said schedule is net, and that the payment of said item or items is not contingent on the fulfillment of any contracts, past or future, and that entries have been made on its books disclosing the absolute sale thereof to Mercantile Trust Company of Illinois, its successors or assigns. The undersigned further agrees to advise Mercantile Trust Company of Illinois, its successors or assigns, of any occurrences that may in any respect impair or reduce the amount shown to be due from debtors on any of the above named contracts or open accounts. It further agrees to submit to Mercantile Trust Company of Illinois, its successors or assigns, the original correspondence or other documentary evidence relating to any of the contracts or open accounts listed above, whenever requested to do so by Mercantile Trust Company of Illinois, its successors or assigns.

"In consideration of the premises aforesaid, and the further sum of one dollar to the undersigned heretofore paid, the undersigned hereby guarantees the payment in full to Mercantile Trust Company of Illinois, its successors or assigns, of the above named contracts and open accounts in accordance with the terms indicated and appearing thereon.

U. S. KELLASTONE Co. (Seal)
Aaron Bodenweiser, *Pres.*

| Sept. 3, 1913 | $339.54—3% Reg. |
| | 8,714.86 |
| | 2,263.60 |
| | $11,318.00 " |

Among other things, the defense was based upon a claim that the contract between the Mercantile Trust Company of Illinois and the United States Kellastone Company was a usurious agreement for the loan of money, which was beyond the powers of the trust company to make under its charter and which was forbidden by the laws of Illinois under which the trust company was organized. There was no dispute in the evidence as to any matter relating to this question. The court instructed the jury that the agreement

273 – 22

between the Kellastone Company and the trust company was a contract of sale and not a pledge or loan, and that if the jury believed that the accounts set forth in the statement of claim were sold by the Kellastone Company to the trust company, and that on account of said sale the trust company suffered a loss, they should bring in a verdict for the plaintiff. It was not disputed that the accounts mentioned in the plaintiff's statement of claim were included in the certificates of indebtedness executed by the Kellastone Company under the terms of the contract between it and the trust company, and the instruction was therefore practically an instruction to find a verdict for the plaintiff. The defendant in error requested an instruction for a verdict in his favor, which the court refused.

In our judgment the contract between plaintiff in error and the Kellastone Company is not an agreement for the sale of accounts, but is an agreement for the loan by plaintiff in error to the Kellastone Company, upon the pledge of the latter's accounts, of seventy-seven per cent of the face of the accounts at a rate of interest equal to one per cent of the face of the accounts for the first fifteen days, two per cent for thirty days, and one per cent additional for each additional thirty days from the date of the advancement of the money until its re-payment. The agreement fixes no price at which the whole interest in the accounts was to be purchased, but contains a scale of percentages for ascertaining the proportion to be retained by the trust company and the proportion to be paid to the Kellastone Company out of the accounts when collected. While it says that the trust company is to pay a percentage of the face value of the accounts on a descending scale from ninety-nine per cent, according to the time when they shall be paid, the instrument goes on at once to provide that the plaintiff in error shall never be required to pay to exceed seventy-seven per cent of the face value. If anything additional was to be received by the Kellastone Company it was to come from

the collection of the accounts themselves and not from the plaintiff in error.   The plaintiff in error was in no event to advance more than seventy-seven per cent of the face of the accounts and in no event was it to receive less than the amount advanced, with interest at the rate of one per cent of the face of the accounts for the first fifteen days, one per cent for the second fifteen days and one per cent for each thirty days after the first thirty days.

While the parties to the contract have carefully used language appropriate to a sale, the instrument, when complete, evidences not a sale but a pledge for the security of a loan.   The form of a transfer of the property in the account is manifestly fictitious.   At no time do the accounts become the exclusive property of the trust company, but its interest in them is limited to the seventy-seven per cent advanced and the proportion of the remaining twenty-three per cent fixed by the scale in the agreement.   This is without regard to the right of the trust company to hold the proceeds of each account as security for the payment of any other account in default, for such right does not necessarily affect the character of the transaction as a sale or a pledge. If the business transacted under this agreement had been limited to a single $100 sixty-day account which was paid at maturity, the plaintiff in error would have advanced $77, the Kellastone Company would have collected the account and paid the plaintiff in error $80, or the plaintiff in error would have collected the account and paid the Kellastone Company $20, and the transaction would have been closed. The plaintiff in error would have had three dollars profit in sixty days on $77 and would never have been under any liability for more than that amount.   If the account was not paid at maturity, then, under the second clause, the Kellastone Company would be bound to pay the plaintiff in error $80.   In either event,—payment of the account or default in payment,—the agreement contemplated the payment of $80 to the plaintiff in error at the expiration of

the credit as the close of the transaction. If this amount was not paid promptly, then the amount to be paid to the plaintiff in error would increase one dollar a month and the amount the Kellastone Company would receive on the final payment of the account would decrease one dollar a month. By the second clause of the agreement a loss is declared to have been incurred by the plaintiff in error whenever an account is not paid at maturity, and the Kellastone Company agrees to pay all losses. It is therefore bound, immediately upon the maturity of any account without payment, to re-pay the amount advanced by the plaintiff in error upon such account and an additional amount according to the stated scale of discounts.

Under the contract in question the Kellastone Company retained an interest in the accounts to the extent of twenty-two per cent of their face value. The test which determines whether the real transaction between the parties was a loan or a sale is the intention of the parties, and their intention is to be ascertained from the whole transaction, including the conduct of the parties as well as their written agreement. In this case, however, it is not necessary to go outside of the contract, which sufficiently shows that the transaction was intended to be a mere pledge of the accounts for a loan of money at a usurious rate of interest. The instrument bears on its face conclusive evidence that it is merely a device to receive more than the law allows for the use of money loaned. The form of the transaction is not material. No device intended to disguise the real character of the transaction can avail to defeat the statute. Calling the transaction a sale of accounts does not alter the fact that the transaction is merely an advancement of money, to be re-paid by the borrower with a rate of interest greater than that allowed by law.

Contracts similar in character to that in controversy have come before United States courts in the cases of *Chase & Baker Co.* v. *National Trust and Credit Co.* 215 Fed.

Rep. 633, *In re American Fiber Reed Co.* 206 id. 309, *Home Bond Co.* v. *McChesney*, 210 id. 893, and *In re Grand Union Co.* 219 id. 353. The first two cases were in the district court, the last two in the circuit court of appeals, the judgment in 210 Fed. Rep. affirming that in 206. In the three latter cases the contracts were held to provide for loans upon pledge and not for sales. The case of *Home Bond Co.* v. *McChesney, supra,* was taken to the Supreme Court of the United States, which has recently affirmed the decree, saying that the conclusion of both the lower courts that the transactions were really loans with the accounts receivable transferred as collateral security seemed so entirely clear that it was unnecessary to discuss the matter at any length. (239 U. S. 568.)

The plaintiff in error has not the corporate power to lend money. It was incorporated under the general Corporation act, and its powers are stated in its certificate of organization, as follows: "To buy, sell, hold and own open accounts, commercial paper, bills of lading, warehouse receipts, bonds and securities, including personal property, leases, choses in action of any and every kind, nature and description; and to buy, sell, hold and own books, pianos, furniture, machines, machinery, merchandise and personal property of any and every kind, nature and description, including the good will and rights of any business; to borrow money, and mortgage, pledge or otherwise charge any or all property and property rights owned by the company; to issue bonds, debentures, certificates, scrip or other corporate obligations to secure the payment of moneys borrowed, and to do a general manufacturing and merchandising business."

There was here no power to make a loan of money, and, in fact, no corporation can be organized under the Corporation act for the business of loaning money. In *Calumet and Chicago Canal and Dock Co.* v. *Conkling*, (*ante,* p. 318,) it was held that if power in a corporation

to lend money can be implied, it can be only where the loan is incidental to an effort to promote the corporate. purposes by the exercise of an express power authorized by the charter of the corporation. "A corporation cannot make loans of money unless the exercise of its chartered powers ordinarily includes such loans." (*Leigh* v. *American Brake-Beam Co.* 205 Ill. 147.) The lending of money was not incidental to any of the corporate powers of the plaintiff in error. "The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental." "A contract of a corporation which is *ultra vires* in the proper sense,—that is to say, outside the object of its creation as defined in the law of its organization and therefore beyond the powers conferred upon it by the legislature,— is not voidable, only, but wholly void and of no legal effect." (*Central Transportation Co.* v. *Pullman Palace Car Co.* 139 U. S. 24.) No action can be maintained upon such void contract by either party against the other. *National Home Building Ass'n* v. *Home Savings Bank,* 181 Ill. 35; *North Avenue Building and Loan Ass'n* v. *Huber,* 270 id. 75; *Calumet and Chicago Canal and Dock Co.* v. *Conkling, supra.*

It is argued that even though the contract is void, the Kellastone Company having borrowed money from the corporation and the defendant in error having procured the loan to be made by his guaranty, they are estopped to insist that lending the money was beyond the power of plaintiff in error. There can be no estoppel, however, where the contract in question is not within the powers conferred on the corporation by law. The cases in which the doctrine of estoppel has been recognized have been where the act complained of was within the general scope of the corporate powers but there has been some irregularity in their exercise. (*National Home Building Ass'n* v. *Home Sav-*

*ings Bank, supra; Durkee* v. *People,* 155 Ill. 354.) "When a corporation acts within the general scope of the powers conferred upon it by the legislature, it, as well as all persons contracting with it, will be estopped to deny that it has complied with the legal formalities which are prerequisite to its existence or to its action because such prerequisites might, in fact, have been complied with. (*Wood* v. *Mystic Circle,* 212 Ill. 532.) But when the contract is beyond the powers conferred upon it by existing laws, neither the corporation nor the other party to the contract can be estopped, by assenting to it or by acting upon it, to show that it was prohibited by those laws. The powers delegated by the State to corporations are matters of public law, of which no one can plead ignorance. A party dealing with a corporation having limited and delegated powers is chargeable with notice of those powers and their limitations and cannot plead his ignorance of their existence." *Steele* v. *Fraternal Tribunes,* 215 Ill. 190; *Converse* v. *Emerson, Talcott & Co.* 242 id. 619.

If the plaintiff in error can recover from the Kellastone Company it is not by virtue of the contract, which was beyond its corporate powers, but under what is stated in *Leigh* v. *American Brake-Beam Co. supra;* to be "the sound and wholesome doctrine that a party cannot retain the benefits, money or property received under a contract which is void merely for want of power to enter into it, without making compensation therefor. Where a contract is *ultra vires* and the corporation has received money under it which in equity and good conscience belongs to another and which it ought to pay over, it is liable for it in an action for money had and received, with interest after demand." It is further said, quoting from *Central Transportation Co.* v. *Pullman Palace Car Co. supra:* "The action is not maintained upon the unlawful contract nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for property or money which

it has no right to retain. To maintain such an action is not to affirm but to disaffirm the unlawful contract." This suit is brought against the defendant in error, however, upon his guaranty of the unlawful contract and not upon the implied contract.

The trial court erred in instructing the jury. It should have given the instruction to find a verdict for defendant.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*

Mr. CHIEF JUSTICE FARMER, dissenting:

As I understand it, there is nothing in the language of the written instrument construed by the court in this case as an agreement or contract for a loan which justifies that construction. On its face it is a clear, definite contract of sale, and to justify holding it to be an agreement to secure a loan, resort must be had to something outside the written instrument. It cannot be denied that a sale may be lawfully made of a chose in action and its payment guaranteed by the vendor to the purchaser. The Kellastone Company owned and had the lawful right to sell accounts it owned and the Mercantile Trust Company had a lawful right to buy them. If the transaction was a sale then no law was violated and it was binding on the parties to it. In determining whether the agreement was one of sale or a loan, resort will first be had to the written instrument itself to ascertain the intention of the parties, but extraneous evidence of facts and circumstances tending to throw light upon the intention of the parties will be heard and considered where the agreement is susceptible of two constructions. That construction should be given a written contract which will best effectuate the intention of the parties to be determined from the whole instrument, and where a contract is susceptible of two constructions, one of which would render it valid and the other invalid, preference will be given the construction which will render it

valid.   Where the language of the instrument is plain and
unequivocal and there is no room for construction, it will
be given its legal effect as written.   (*Clark* v. *Mallory*, 185
Ill. 227.)   These settled rules of law seem to me to be vio-
lated by the opinion of the court in this case.   I am un-
able to find in this record evidence of any extraneous facts
and circumstances to show any different intention from
that expressed in the language of the written contract.
The contract is the language of both parties, and by its
terms the transaction was a sale.   No language in it jus-
tifies holding the parties did not mean what they said but
meant something else, and no other circumstances proven
justify the construction given this contract by the court.
The contracts construed in the Federal cases cited in the
opinion were unlike the one here involved.   In the *Home
Bond Co. case* and the *Grand Union Co. case* the contracts
expressly provided that if the accounts assigned were not
paid at maturity the vendor or assignor would re-purchase
them from the vendee or assignee.   There is no such pro-
vision, expressed or implied, in the contract considered in
this case.   It does not seem to me there is anything more
in the contract to indicate the transaction was a loan than
there would be in the contract of an indorser or guarantor
of a promissory note.   As I view this case the parties in-
tended the transaction for a sale.   They used language
which expressed that intention, and nothing appears in the
record to justify attributing to them a different intention
from that expressed in their own language.

Mr. JUSTICE DUNCAN, also dissenting.