NATIONAL TRUST & CREDIT CO. v. F. H. ORCUTT & SON CO. et al.

(Circuit Court of Appeals, Seventh Circuit. April 2, 1919. Rehearing Denied May 15, 1919.)

No. 2662.

1. SALES ⬤⮎6—CONSTRUCTION—CONTRACT FOR LOANS OR SALES OF ACCOUNTS.
    A contract under which a mercantile company assigned accounts against its customers, which it guaranteed to the other party, which advanced a stated per cent. of their face value, collected the same, and, after deducting the advance, expenses, and an agreed charge, returned the balance to the company under the law of Illinois and of the federal courts, is a loan contract, and not one for the sale and purchase of the accounts.

2. CORPORATIONS ⬤⮎487(1)—CONTRACTS ULTRA VIRES.
    A contract by defendant corporation to lend money to complainant, which defendant was without charter power to make, is void, and neither party can enforce it or predicate upon it any right of recovery.

3. ACCOUNT ⬤⮎1—GROUNDS FOR ACCOUNTING—TRANSACTIONS UNDER VOID CONTRACT.
    An accounting may be had based upon a series of transactions between the parties, although they took place under a contract which was void for want of power in one party to make it.

4. USURY ⬤⮎102(1)—RECOVERY OF USURY PAID—EFFECT OF SETTLEMENT.
    Under the law of Illinois, as by the general law, transactions tainted with usury, but which have been definitely settled and closed as between

the parties, cannot thereafter be made the subject of recovery or accounting respecting the usurious interest paid.

5. ACCOUNT ⊶1—ACCOUNTING—SEPARATE TRANSACTIONS.

Where complainant from time to time assigned accounts receivable to defendant pursuant to a contract void for want of power in defendant to enter into it, but under which complainant received an advance on the accounts received at any one time, and on their collection received back the balance above the advance less certain charges, each of such transactions was separate, and when so closed was settled independently of the others, and not subject to a future accounting.

Evan A. Evans, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by the F. H. Orcutt & Son Company, and David D. Miller and William A. Maurer, as trustees for the creditors of the F. H. Orcutt & Son Company, against the National Trust & Credit Company. Decree for complainants, and defendant appeals. Reversed.

John W. Creekmur and Donald J. De Wolfe, both of Chicago, Ill., for appellant.

William S. Oppenheim, of Chicago, Ill., for appellees.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge. [1] Appellant, a business corporation organized under the general incorporation laws of Illinois, for the purpose inter alia of purchasing accounts receivable, made a written agreement at Chicago, May 26, 1910, with appellee F. H. Orcutt & Son Company (referred to herein as the Company), a Nebraska wholesale merchandising corporation, the general purport of which is that thereafter the Company might sell and duly assign to appellant such of the Company's customers' current accounts as it desired so to dispose of, and that appellant should upon such of the accounts as it approved at once pay the Company about 80 per cent. of the face thereof; that the Company as agent for appellant should receive from the customers the remittances for the accounts, and as received send them to appellant, which was given power of attorney to indorse them; whereupon appellant should deduct therefrom its first advance, its own charges, and whatever if any expense it had incurred, and remit the rest to the Company as payment of the balance of purchase price of such accounts. The Company guaranteed the payment of all the accounts, and agreed to pay appellant within five days after notice of default the face value of defaulted accounts.

Upon the execution of the contract dealings between the parties, substantially on the plan outlined in the contract, commenced, and actively continued for over two years, covering hundreds of separate accounts aggregating in face value nearly half a million dollars. In 1912 the Company became deeply involved, and the number of accounts grew less, and in September appellant terminated the Company's agency to collect assigned accounts and itself proceeded to collect them. In December the Company, with the consent of all the

creditors (except appellant), made a general assignment for the benefit of its creditors, and there then remained unpaid of previously assigned accounts somewhat over $75,000, which appellant was undertaking itself to collect. Where remittances came to the trustees they sent them to appellant.

The amounts which appellant retained ostensibly as the profits in the transactions exceeded the maximum which under the interest laws of Illinois may be taken as interest on loans. The bill herein, filed May 13, 1914, by the Company and its trustees, is predicated on the claim that these transactions between the parties, while purporting to be sales of accounts, were in fact loans from appellant to the Company; that the interest on such loans which appellant really contracted to receive, and did receive, was usurious; and that appellant should be required to account for all such usurious payments of interest beyond the Illinois noncontract rate of 5 per cent. per annum. An amendment to the bill set up the additional claim that appellant had no charter power to make loans, and that as a loaning agreement the contract was unlawful and void, but did not affect the relief demanded in the bill.

Upon this basis accounting was ordered, resulting in a decree against appellant for $17,353.38, after allowing it various items for service and expense in the collection of certain of the later assigned accounts.

Appellant contends that the contract was one of sale and not of loan, wherefore the transactions were within appellant's charter powers, and were not subject to the complaint of usury; and that in any event many, or most, of the transactions were, as between the parties thereto, settled and closed, and were not properly subject to be reopened for inclusion in the accounting.

The contract here is in all essentials like those which the federal and the Illinois courts have held to be in fact loaning contracts, and not contracts for sale of accounts as on the face they purport to be, and the transactions under them to be loans and not sales. Mercantile Trust Co. v. Kastor, 273 Ill. 332, 112 N. E. 988; Dorothy v. Commonwealth Co., 278 Ill. 629, 116 N. E. 143; Home Bond Co. v. McChesney, Trustee, 239 U. S. 568, 36 Sup. Ct. 170, 60 L. Ed. 444; In re Grand Union Co., 219 Fed. 353, 135 C. C. A. 237. The contract in question must therefore be regarded as if loans, and not sales, were its subject-matter. But, appellant being organized under the general incorporation act of the state of Illinois, it concededly follows that it had no power under its charter to engage in the loaning business, and that its loaning transactions are, as such, ultra vires and void. Mercantile Trust Co. v. Kastor, supra; Calumet, etc., Dock Co. v. Conklin, 273 Ill. 318, 112 N. E. 982, L. R. A. 1917B, 814; North Avenue Building & Loan Association v. Huber, 270 Ill. 75, 110 N. E. 312, Ann. Cas. 1917B, 587; Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55.

[2] Holding, as we do, that the real transaction between these parties was intended to be, and was in fact, for loans of money and not sales of accounts, and that appellant had not the legal capacity to enter into such transactions, the contract had no validity whatever,

and neither party could enforce it, nor predicate upon it any right of recovery.

[3, 4] Accounting upon the long series of transactions between these parties is permissible, not because of the void contractual relation, but because of what the parties actually did in the course of their dealings. But, in so far as the accounting was had upon the theory that the profits which appellant took for the making of loans were larger than the maximum interest rate allowed by the Illinois statutes, it must be said that under the law of Illinois transactions tainted with usury, but which have nevertheless been definitely settled and closed as between the parties thereto, cannot thereafter be made the subject of a recovery or accounting for the usurious interest payments. Dorothy v. Commonwealth Co., supra; Richter v. Burdock, 257 Ill. 410, 100 N. E. 1063; Lake v. Brown, 116 Ill. 83, 4 N. E. 773; Riddle v. Rosenfeld, 103 Ill. 600. This is likewise the law generally respecting recovery and accounting for transactions had pursuant to contracts void only for lack of power to enter into them. In Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55, recovery was sought of rent specified to be paid by the Pullman Company under a lease to it of the cars of another sleeping car company. The court held that the lease was one which the parties to it had not the power to make, and that it was "wholly void and of no effect," and recovery under the lease was denied. But in a subsequent action, involving accounting between the same parties, respecting the same property, and under the same purported leasing contract, the same court, adhering to its previous conclusion of the invalidity and unlawfulness of the lease, said, respecting demand for accounting for the rents paid:

"During the fifteen years elapsing from 1870 to 1885 no violation of the terms of the lease by either party is complained of, and we think the whole transaction between the parties during those fifteen years must be treated as closed, so that no examination should be made in regard to anything that happened within that time." Pullman's Car Co. v. Central Transp. Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108.

See, also, St. Louis R. R. v. Terre Haute R. R., 145 U. S. 393, 12 Sup. Ct. 953, 36 L. Ed. 748; Spring Co. v. Knowlton, 103 U. S. 49, 26 L. Ed. 347; Thomas v. Railroad Co., 101 U. S. 71, 25 L. Ed. 950; Thomas v. City of Richmond, 12 Wall. 349, 20 L. Ed. 453; Leigh v. American Brake-Beam Co., 205 Ill. 147, 68 N. E. 713.

[5] The executed agreement here merely set out the basis for future dealings of the parties. If, after its execution, the Company had sent no accounts to appellant, that would have been the end of the business, for the contract distinctly states that the Company was not obligated to sell any accounts. While the contract, treated as a loaning agreement, is void, yet, in order to arrive at an understanding of what the parties actually did, it is proper and well to know what they mutually purported or intended to do, and resort may be had to anything that will throw light thereon—even for such purpose to the contract itself, however void as an obligation. What they actually did, viewed in the light of what they intended to do, must de-

259 F.—53

termine what, if any, of their many transactions were closed and settled. For such closure and settlement no particular form or ceremony was necessary. Receipts need not be passed nor formal declaration made. If the fair and reasonable deduction from the acts and conduct of the parties is that certain of their transactions were as between them closed and settled, they are closed and settled accordingly. The evidence bearing upon this subject is practically undisputed, the question being as to the legal effect to be given it.

After the execution of the contract the Company at once began sending accounts to appellant, each time making formal written assignment of the accounts sent. They were sent at first as often as once a week, and thereafter more frequently—as often as daily; but for some months prior to the end of the business the volume was much less. In each instance appellant paid (on the purported purchase price therefor) approximately 80 per cent. of the face of the accounts sent, and remitted the balance, less its charges, after the customer had fully paid the account, rendering an account of the full transaction. The accounts were practically all 60-day accounts, and, if not paid when due, the Company generally sent appellant check for the full amount of the unpaid account, and appellant would promptly settle with them for the amount withheld on the purported purchase price. Sometimes instead of cash they would send another account in the place of the one past due.

It is apparent that when all of the accounts upon which a particular advance had been made by appellant were settled by the customers, and the retained 20 per cent. adjusted between appellant and the Company, such transaction, be it sale, loan, or advance, was, as between these parties, considered wholly closed and settled. The testimony of the Orcutts is illuminating and convincing not only as to what the parties actually did, but also as to their intention and state of mind with respect to the closing of transactions. Louis Orcutt, the secretary, testified:

"When these various accounts were paid, the checks or remittance came to the F. H. Orcutt & Son Company, and we then transmitted that check in its original to the National Trust & Credit Company. That was the general practice. When they received the check they collected it through their bank, and then remitted to us 20 per cent. which they had withheld. That item was then closed and settled. At the time that second payment of 20 per cent. was made to us a sheet or document showing what accounts were thereby fully paid was sent us. I think it was called a remittance sheet. This remittance sheet referred to the account, and by reference to our books as to this account and by reference to the check we could see whether or not they had paid the entire price for the account. I always checked that up to be sure that they were right. I found them always right. The second payment of the account, which amounted to 20 per cent. of the face of the account less certain deductions that may have been made by the customers, was always made shortly after the account itself was paid. They were always absolutely correct in all of their dealings until the fall of 1912. * * * As to the accounts which had been paid up to September, 1912, the 20 per cent. referred to had been fully taken care of by the remittance sheets and the checks accompanying the same, except some on which there was a difference of opinion as to the amount due them. I mean that they were all taken care of, that the 20 per cents. were all paid except some few individual items. * * * There was an occasional

mistake in their office as to matters of deduction. Occasionally items would creep up which I do not think were just under the contract. Up to September 1, 1912, these were invariably adjusted. All the questions which the National Trust & Credit Company raised were taken care of between us and their company by their auditors. But some questions that I raised were settled directly by correspondence."

It appears that on past-due accounts appellant charged the Company additionally at the rate of 1 per cent. per month, and Orcutt said:

"As a matter of protection we took up all accounts that had passed their net due dates; that we sent them our check nearly every day for more or less of an account. * * * They were always for the full face value. * * * The National Trust & Credit Company upon receipt of this check would receive them as any other checks received in settlement of an account; that is, they retained 20 per cent. margin plus or less the discount, as the case might be. That was the usual practice in our dealings for two and a half years or more. * * * I remember one of the representatives of the National Trust & Credit Company was at our place several times in the fall of 1912. He was there early in September, and we made settlement with him for all of the delinquent accounts."

Of these same matters F. H. Orcutt, president of the Company, testified:

"Continued to deal with the National Trust & Credit Company from the latter part of May, 1910, until September or October, 1912. During that time we sent them our bills receivable and received back their checks very promptly. We received 77 per cent. of the face of the bills receivable. We found all our bills 60-day paper, so we settled it on one proposition, 77 per cent. It was all 60-day paper. As we went along we received statements from the National Trust & Credit Company. We checked these over and filed them away, I suppose. * * * When we first began doing business with the National Trust & Credit Company we assigned accounts to them about once a week. Later we assigned accounts more frequently, sometimes every day. The settlements were made on the accounts which were not paid by the debtors when the auditor came around. He would fix them up and we would give him a check in full. We would give him a check for the face of the amount. * * * I let go of the affairs of the Company just before Thanksgiving, 1912, and turned it over to Mr. Miller. He is now one of the trustees. The business was in Mr. Miller's charge at that time. Mr. Miller was one of the five directors of the Company at the time this contract was made with the National Trust & Credit Company and continued active in the affairs of the Company ever since. Up to the time I let go of the business there had been practically no dispute between us and the National Trust & Credit Company. They had paid us all the moneys for all these accounts and made settlement for every account. Everything had been satisfactory up to that time, or reasonably so. They still had a large number of accounts which had not been settled for when I let go of the business. * * * We followed this matter up with very great care, and I think we got all of our money as fast as it became due."

It is evident that toward the end, when the Orcutt corporation was in deep water, there was considerably more trouble with the assigned accounts. In September appellant itself began collecting the accounts from the customers, who up to that time had not been informed of appellant's relation to them.

If, as between these parties, a settlement was effected on the basis of the transaction being sales, the fact that they were loans, and not sales, would not unsettle what had been theretofore in good faith set-

tled. If the first transaction under the contract had been the only one, and the advance, collection of account, remittance, and disposition of the 20 per cent. had been made just as was done, and if then four years had passed before suit was brought to recover alleged usurious interest payments, it is scarcely conceivable that there would be difficulty in concluding that such transaction had been by the parties long settled and closed. No different rule should be applied if such first transaction had been followed by many others similar in kind. Advances and remittances were never general or "on account," but always bore direct relation to particular transactions and accounts, to which they were exclusively applicable.

From this evidence of appellee Company's officers, wholly apart from the contract itself, we cannot avoid the conclusion that very many of these transactions, particularly those in the earlier part of the series, if treated as loans, were fully repaid long before the beginning of this suit, and were deemed by the parties, as in fact they were, closed, settled, and ended. They were in respect to matters which involved no moral turpitude, the contract being void merely because of the legal incapacity of one of the parties to enter into it. Leigh v. American Brake-Beam Co., 205 Ill. 147, 68 N. E. 713. If, as Louis Orcutt testified, prior to the fall of 1912 the "20 per cents" were all settled, it follows that the accounts out of which they grew were settled, and that the several advances to the Company made on the basis of the accounts out of which the "20 per cents" arose were perforce likewise settled and ended. If the transactions were sales as purported, the settlement of the "20 per cents" completed payment of the purchase price; if loans, or mere advances, the settlement of the "20 per cents" indicates that the loans or advances were fully repaid. All the transactions which at the beginning of the suit were so disposed of should have been excluded from the accounting.

The various individual accounts purporting to have been sold to appellant are not to be regarded as each of them constituting a separate transaction, but each payment or advance made by appellant upon the strength of accounts which were sent on by the Company as the purported basis for such particular payment or advance by appellant should be considered as constituting a separate transaction, and to be regarded as closed and settled if and when all the accounts included in any such transaction have been fully paid and accounted for, or otherwise finally disposed of between appellant and appellee, so that at the time of the beginning of the suit (or the earlier repudiation by appellee of the purported contract, if this appear) nothing further remained to be done as between these parties respecting any one or more of the accounts included or involved in such separate transaction as herein defined.

The decree of the District Court is reversed, with direction to restate the account, and exclude therefrom all items which, under the foregoing views, were closed and settled.

EVAN A. EVANS, Circuit Judge (dissenting). I am unable to agree with the conclusions reached by the majority of the court.

With the conclusion that the agreement under consideration was in fact a loan agreement I fully agree. Home Bond Co. v. McChesney, 239 U. S. 569, 36 Sup. Ct. 170, 60 L. Ed. 444. That it was beyond the corporate powers of the National Trust & Credit Company to loan money is conceded. That such a contract is therefore void under the laws of Illinois is also well established. Mercantile Trust Co. v. Kastor, 273 Ill. 332, 112 N. E. 988; Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55. It follows, therefore, that the decree should be affirmed unless (as the majority of the court concludes) certain of the transactions were "closed."

It appears that outstanding accounts aggregating some $76,000 were in appellant's possession and given to secure unpaid obligations when the voluntary assignment occurred. All the loans and payments were made pursuant to the terms of the void contract. The excessive interest items as well as the so-called service charges were paid by the borrower upon the theory that a valid contract between the parties called for such payments. If we eliminate from the parties' transactions the contract and its influence upon the parties, there is nothing left but a few cash items on the side of the loaner and many smaller items of cash credited to the borrower. The sum totals cannot be made to balance, collectively or otherwise. A so-called closed or balanced account is spelled out of the record only by giving appellant credit for its 1 per cent. per month interest and allowing its expense and service charges—all as provided in the contract.

Such a settlement as furnished the basis for appellant's claim of a closed account was nothing but a ratification of the void contract. And it is thoroughly established that any contract malum in se is incapable of ratification. Westerlund v. Bear Mining Co., 203 Fed. 599, 612, 121 C. C. A. 627.

My conclusion is strengthened by the fact that the parties made a contract in writing before any moneys were advanced by appellant. In fact, the subsequent dealings were not separate and independent transactions, but were the fulfillment of the written contract referred to. This contract required appellant to "buy from said first party all acceptable accounts tendered it * * * and pay therefor the face value thereof, less the following discounts," etc. All the dealings between the parties were pursuant to this one illegal contract. Moneys may have been advanced at different times, and certain payments on the moneys thus advanced may have been made at other dates, but nevertheless all subsequent transactions of both parties were referable to this contract and determined by it.

Moreover, this is a suit in equity. Appellant has avoided the full consequences of its transaction because it is in a court of equity. Appellant saw fit to enter into a contract prohibited under the laws of the state of Illinois and in violation of its powers under its charter. Not satisfied with avoiding the full penalties that might result from its embarrassing position, it asks this court of equity that has required the borrower to repay all moneys borrowed together with legal interest to go one step further. It prays for the allowance of excessive

interest and illegal charges. Seeking equity, appellant should do equity. Obtaining relief from the unfortunate position in which it has found itself, due to its illegal contract, it should offer to, and, if its consent be not forthcoming, be compelled to do equity. Equity is done only when the debtor pays back to the creditor under this one single written contract all moneys by it paid, together with interest thereon. The creditor does equity only when it repays to the borrower or gives to the borrower credit for the usurious and excessive sums taken by it under and by virtue of this illegal contract. Mercantile Trust Co. v. Kastor, supra.

Nor is this conclusion out of harmony with that reached in Pullman's Palace Car Co. v. Central Transportation Co., 171 U. S. 138, 18 Sup. Ct. 808, 43 L. Ed. 108. In that case a closed transaction was assumed. The court considered the question of its effect. Here I fail to find the facts showing that accounts were "closed."

Again, to hold otherwise it seems to me would defeat the plain purpose of the statute of the state of Illinois, long expressive of the public policy of that commonwealth. For if an illegal contract can be purged of its illegality by the simple device of drawing a new contract, thereby "closing" the old one, a simple and satisfactory plan has been provided for corporations to engage in a forbidden business. Likewise the worries of the usurer are over, for a simple and effective way has been provided whereby he can retain his excessive interest.