COMMERCIAL SECURITIES COMPANY V. G. M. REA ET AL.

No. 6882.   Decided June 9, 1937.
Rehearing overruled July 7, 1937.
(105 S. W., 2d Series, 872.)

*J. P. Markham, Jr., T. J. Stovall,* and *W. F. Tarver,* all of Houston, for plaintiff in error.

*J. S. Bracewell, Chas. B. Spiner,* and *Phil D. Woodruff,* all of Houston, for defendant in error.

MR. JUDGE GERMAN delivered the opinion of the Commission of Appeals, Section A.

The question involved in this suit is one of usury: Plaintiff in error, Commercial Securities Company, brought this suit against defendant in error, G. M. Rea, to recover the sum of $1,683.94, with interest from and after November 1, 1930. Defendant in error J. S. Bracewell was also sued upon his guaranty to the extent of $1,000.00. Plaintiff in error will be referred to as the Credit Company. Defendant in error Rea set up a cross action, alleging that in the course of dealings with the Credit Company he had paid usurious interest, and by way of offset sought to recover double the amount of such usurious interest paid. Trial in the district court resulted in a judgment in favor of Rea in the sum of $184.60, after he had obtained a set-off against the amount found to be due by him to the Credit Company. This judgment was affirmed by the Court of Civil Appeals. 78 S. W. (2d) 707.

On August 13, 1929, Rea entered into a written contract with the Credit Company. This contract is set out in full in the opinion of the Court of Civil Appeals. It will be referred to as the "formal contract." It purports to be an arrangement between the parties for a sale of accounts by Rea to the Credit Company. Rea is referred to therein as dealer and will be so designated here. At the time of making the contract he was engaged in the business of selling radios and radio equipment. In such business he received from his customers notes and other obligations secured by chattel mortgages upon the merchandise sold by him. These were referred to as accounts. As we must look through the form of the contract to see just how these parties conducted their business, and just what was the legal effect of all that they did, we will set out only in a very condensed manner the purported provisions of the formal contract.

(1) The dealer from time to time was to tender to the Credit Company such of its accounts as it desired to sell. The Credit Company had ten days within which to select the accounts it desired to purchase. For such accounts as it wished to purchase it was to pay the dealer therefor the "purchase price as mutually agreed upon" between them.

(2) Upon any purchase being made dealer was to execute

to the Credit Company an assignment of the account or accounts and all the right, title and interest of the dealer therein. If no formal assignment was executed, payment by the Credit Company would ipso facto amount to an assignment. The dealer would from time to time make entries on his books showing assignment to the Credit Company of the accounts.

(3) The Credit Company was to have full authority to collect all accounts, and all amounts paid to the dealer on accounts were to remain the property of the Credit Company. If requested by the Credit Company to do so, the dealer was to act as agent in making collections without cost to the company, and agreed to remit all proceeds to the Credit Company. The dealer further agreed to make full payment to the company of the unpaid balance on all purchases returned or repossessed, and of any credits allowed by dealer to the customer.

(4) The dealer unequivocally guaranteed the prompt payment of the principal and interest of all accounts, together with attorneys' fees and expenses incurred in collecting same, if collected by the Credit Company. The dealer guaranteed the correctness of all accounts, that the articles had been delivered, that the net amount of accounts had not been disputed, and that the debtor named in each account was solvent. Under this guaranty the security company had the right to mature accounts, and upon giving notice of such action the dealer agreed to pay in full the amount of all unpaid balance of such matured accounts with interest, attorney's fees and expenses.

(5) As a guaranty fund to secure the performance of the obligations of the dealer it was agreed that the dealer would keep on deposit with the Credit Company such sum as might be agreed upon from time to time.

It is the contention of the Credit Company that the contract contemplated a bona fide sale of accounts at an agreed discount, and that the mutual dealings of the parties amounted to nothing more than this. On the contrary, it is the contention of defendant in error Rea that the formal contract, in light of the actual dealings between the parties, amounted to a loan transaction, by virtue of which Credit Company collected interest in excess of the amount allowed by law. Standing alone, the formal contract evidenced a sale and purchase of accounts, but some of its features are highly suggestive of a loan transaction, and this makes it necessary to detail as accurately as we can just what in reality took place between the parties.

By way of preliminary statement it is proper to say that the dealer did not have sufficient capital upon which to operate

his business, and at the time the formal contract was executed was in need of financial assistance. He called upon the Credit Company for help. The method followed by the parties was substantially this: When in need of money the dealer submitted to the Credit Company, upon a printed form furnished by the company, a schedule of accounts entitled "Schedule offered for sale to Commercial Securities Company." The introductory statement was as follows: "This is to certify that the persons named below are indebted to the undersigned for merchandise sold and delivered in the sums opposite their names." Then followed a statement of the names and addresses of the purchasers, with date of sale to each. Next was the amount of original purchase, and then the balance unpaid. This was followed by a statement of the amount of monthly payments and the number of months the accounts had to run. The next column is entitled "Discount Rate," and this was followed by "Service Charge." The discount rate appears to be 9 per cent. on a 12 months basis. For instance, on accounts having 12 months to run it was 9 per cent. On accounts having 11 months to run it was 8 1/2 per cent. On accounts having 10 months to run it was 8 per cent. On accounts having 8 months to run it was 7 per cent. Most of the schedules showed accounts maturing in ten or twelve months, but a few matured in less time. In the column entitled "Service Charge" was entered a sum equal to the discount upon the unpaid balances of accounts calculated for the time the accounts had to run on a basis as above indicated.

In the upper left-hand corner of the schedule was entered the total face value of the accounts. Next was entered the "Reserve," which was a sum equal to 15 per cent. of the gross value of the accounts. Next was entered the balance after deducting the reserve. From the balance was deducted the "Service Charge," being the total of discounts from the unpaid balances of the several accounts, leaving the amount due the dealer. Taking Schedule No. 1 as an example it shows the following: First, a total of 8 accounts, the gross value being $834.09. The reserve, or 15 per cent. of the gross value, is entered as $125.11. This leaves a "balance" of $708.98. The service charge is $64.95, having been arrived at in the manner above indicated. This being deducted leaves an amount due the dealer of $644.03. It is undisputed that this is the amount paid by the Credit Company to the dealer for this particular schedule of accounts, and it is further undisputed that a sum arrived at in the same manner was what was paid for each of the remaining schedules.

In the upper right-hand corner of the printed form is a statement entitled "Schedule of Payments." In practically every

instance this indicates a schedule of 12 monthly payments. These payments appear to have been arrived at by taking the sum advanced or paid to the dealer, plus the service charge, as the amount to be covered by the schedule of payments, and this was divided into 12 monthly installments, the amounts of which were determined by the sums maturing from month to month upon the unpaid portion of the respective purchase money accounts. The result of this arrangement was at least an implied contract to repay in every instance the amount paid by the Credit Company to the dealer, plus the so-called "Service Charge"; and these two in all instances amounted to exactly 85 per cent. of the face value of the accounts.

Looking now to the method of keeping accounts, we find the arrangement as disclosed by the schedule sheets was carried out. Taking for instance Schedule No. 1 as an example we find the following: As of the date of the origin of the account we find the dealer was debited with the sum of $834.09, being the gross value of the several purchase contracts. Next is entered the monthly credits in exact correspondence with the monthly installments set out in "Schedule of Payments." As above indicated, the payments total 85 per cent. of the gross value of the accounts. Then follows an entry "Reserve Charged Off," showing credit of the reserve of $125.11, which exactly balanced the account. It appears that the dealings of the parties involved seventeen schedules. The first 14 of these are balanced in the manner above indicated; that is, by repayment by the dealer to the Credit Company of 85 per cent. of the face value of the accounts, followed by a bookkeeping entry of credit of the reserve of 15 per cent., resulting in balancing the accounts.

It will be observed that the formal contract provided for a "guaranty fund," which was to be kept on deposit by the dealer. It is undisputed that no such fund was ever created, but it is contended by the Credit Company that it withheld payment of the 15 per cent., constituting the reserve, for the purpose of creating this guaranty fund and that at certain intervals, to-wit, when the purchasers' accounts with the dealer were finally settled, it would credit the dealer with the reserve.

It seems to be undisputed that the dealer retained possession of the notes and accounts, and, prior to default, alone dealt with purchasers in the matter of collecting accounts and making adjustments. There is no proof that the Credit Company ever had anything to do with collecting accounts, prior to default by the dealer, and incurred no expense in that way. In lieu of the notes and accounts it appears that the dealer furnished the Credit Company with the schedules, containing description of the

various accounts, with formal assignment and guaranty in exact language of the formal contract. These schedules were in turn pledged or assigned by the Credit Company to the Second National Bank as security.

The inescapable inference from the whole proceeding is that in every instance it was definitely understood that the Credit Company was to pay to the dealer a sum equal to only 85 per cent. of the face value of the accounts, less the service charge, which in every instance amounted to more than 10 per cent. of the amount actually paid the dealer calculated on a basis of 12 months. It is a further inescapable inference that the Credit Company never intended to pay the dealer the 15 per cent. reserve, but on the contrary every circumstance indicates that this 15 per cent. was regarded as belonging to the dealer, and was unquestionably his property if, as, and when collected by him from the purchasers, provided he met his schedule of payments, as was done with the first 14 of the schedules. In other words, it seems to us unquestionably true that the sole purpose of the Credit Company was to devise a plan by which it was to be secure in the payment to it of a sum equal to 85 per cent. of the gross value of all accounts listed with it, in consideration of a loan or advancement in a sum equal to 85 per cent. of the value of accounts discounted on a basis of 9 per cent. It is undisputed that the Credit Company did no substantial service for which a service charge could appropriately be made. While appearing in the form of a discount, this service charge was undisputably included in the schedule of payments and it is unmistakably shown that it was intended to be repaid along with the amount advanced by the dealer. The absolute obligation for payment was created by the guaranty of the face value of all accounts. This so-called "service charge" was, in our opinion, manifestly interest, taken off as a discount, but to be repaid as a part of the 85 per cent. of the face value of the accounts. It is admitted that if it were interest it was in excess of the amount allowed by law.

While there is a lack of specific proof showing that the parties expressly entered into a loan transaction, nevertheless their acts and dealings, as evidenced by the schedules and the book accounts, as well as by the parol evidence itself, lead us to the conclusion that there never was a bona fide sale and purchase of the accounts. Regardless of the language in which the formal contract was couched, it is evident that this was not in fact all of the understanding between the parties. Their actions speak louder than their words. Considering the inevitable result of all that was done, we are led somewhat reluctantly but in-

escapably to the conclusion that the transaction, when reduced to its least common denominator, amounted to a loan, and the assignments passed title to the accounts as security only.

Transactions under guises almost identical with the formal contract involved in this instance have been before the courts in numerous cases. In all of these cases the courts have looked to the acts and dealings of the parties and in practically every instance have found that the transaction was a loan. The unanimity with which such result has been reached is strong assurance of the correctness of our conclusion in this case. Among the pertinent cases are the following: Home Bond Co. v. McChesney, 210 Fed. 893, affirmed in 239 U. S. 568, 36 Sup. Ct. 170, 60 L. Ed. 444; In re Grand Union Co., 219 Fed. 353; In re American Fibre Reed Co., 206 Fed. 309; National Trust & Credit Co. v. Orcutt & Son, 259 Fed. 830; Commercial Security Co. v. Holcombe, 262 Fed. 657; Petition of National Discount Co., 272 Fed. 570; LeSueur v. Manufacturers Finance Co., 285 Fed. 490; McWhite v. State, 143 Tenn. 222, 226 S. W. 542; Mercantile Trust Co. v. Kastor, 273 Ill. 332, 112 N. E. 988; Dorothy v. Commonwealth Com. Co., 278 Ill. 629, 116 N. E. 143, L. R. A. 1917E, 1110; Brierley v. Commercial Credit Co., 43 Fed. (2d) 724.

We are of the opinion that the facts and circumstances were amply sufficient to authorize a finding by the trial court that the transaction was a loan, and that plaintiff had collected usurious interest in the amount found.

The judgment of the Court of Civil Appeals is therefore affirmed.

Opinion adopted by the Supreme Court June 9, 1937.

Rehearing overruled July 7, 1937.