HOME BOND COMPANY *v.* McCHESNEY, TRUS-TEE IN BANKRUPTCY OF AMERICAN FIBRE REED COMPANY AND NEW ENGLAND CHAIR COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 90. Argued December 3, 1915.—Decided January 10, 1916.

This court follows the conclusions, reached by the Special Master and affirmed by both courts below, that transactions purporting to be purchases of accounts receivable from the bankrupt were really loans with the accounts transferred as collateral security.

210 Fed. Rep. 893, affirmed.

THE facts, which involve construction of contracts between the bankrupt and one dealing with him and determination of whether such contracts were purchases of accounts or loans with the accounts as collateral, are stated in the opinion.

*Mr. Robert Kinkead,* with whom *Mr. S. M. Sapinsky, Mr. James R. Duffin, Mr. Owen D. Duffin* and *Mr. S. M. Stockslager* were on the brief, for appellant.

*Mr. Lewis A. Nuckols,* with whom *Mr. John Bryce Baskin* and *Mr. Eli H. Brown, Jr.,* were on the brief, for appellees.

Mr. Justice Pitney delivered the opinion of the court.

The New England Chair Company, and its successor, the American Fibre Reed Company, are Kentucky corporations which were engaged in business at Frankfort, in that State. On February 1, 1912, involuntary petitions in bankruptcy were filed against both companies, and they were duly adjudicated bankrupts. The two cases in bankruptcy were consolidated and directed to proceed as one cause, and the estates are under administration as one estate. The present appellant, The Home Bond Company, an Indiana corporation, filed intervening petitions, claiming certain funds in the hands of the trustee, obtained by him through the collection of accounts receivable of the bankrupt corporations, to which the petitioner claimed title under two contracts in writing made between it and the respective corporations; one with the New England Chair Company under date March 6, 1911, the other with the American Fibre Reed Company under date November 9, 1911, after the latter had taken over the assets and assumed the liabilities of the Chair Company. These agreements are identical in form, and a copy of one is set forth in the margin.[1]

---

[1] This agreement, made this 6th day of March, 1911, at Indianapolis, Indiana, by and between New England Chair Co., hereinafter called first party, and the Home Bond Company, hereinafter called second party.

Witnesseth, that, for One Dollar ($1.00) and other good and valuable

Petitioner also set up a claim against the trustee for the sum of $800, being $100 per month from March 16 to October 12, 1912, inclusive, paid by it to one Manning,

considerations, each to the other paid, receipt whereof is hereby acknowledged, the parties hereto have agreed and do hereby agree as follows:

First. That said second party shall buy from said first·party all acceptable accounts tendered to it by said first party and pay therefor the face value thereof less the following discounts:

1 per cent. on accounts that are paid within 15 days;

2 per cent. on accounts that are paid within 30 days;

3 per cent. on accounts that are paid within 60 days;

4 per cent. on accounts that are paid within 90 days;

5 per cent. on accounts that are paid within 120 days;

6 per cent. on accounts that are paid within 150 days;

7 per cent. on accounts that are paid within 180 days;

subject however, to the terms of this and any subsequent written agreements executed by the parties hereto.

Second. That the second party shall pay:

78 per cent. on 30 day accounts;

77 per cent. on 60 day accounts;

76 per cent. on 90 day accounts;

75 per cent. on 120 day accounts;

74 per cent. on 150 day accounts;

73 per cent. on 180 day accounts;

upon delivery to and acceptance by second party of such accounts duly assigned to the party of the second part; and the remainder, less discount and deductions taken by the debtor, shall be paid immediately after the collection of the account by the second party, provided, however, no payment of the remainder shall be made while any of said accounts are in default.

Third. The first party shall properly assign and deliver to said second party all accounts purchased, including the right of stoppage in transitu, either in the name of the party of the first part or in the name of the party of the second part (provided, however, the party of the.second part shall not be charged with negligence in not making stoppage in transitu in any event unless thereunto requested by the party of the first part). If the merchandise named in. the accounts should be refused or returned, for any cause, the title to such merchandise shall be and remain in said second party until such accounts are paid.

Fourth. Said first party hereby guarantees the payment to the second

who in the sixth clause of the contract of November 9, 1911, was by the Reed Company appointed attorney in fact to receive remittances in payment of the accounts

---

party or its assigns of all accounts purchased hereunder according to the terms thereof.  In the event of non-payment at maturity to said second party, of any accounts purchased as aforesaid, or should the debtor become insolvent, said first party hereby covenants and agrees to repurchase said accounts within five days after receipt of written notice thereof, and to pay therefor the same amount paid to the first party by said second party, plus the discount provided for in the first paragraph of this contract; said second party is hereby given the right without notice to said first party to credit any moneys coming into its possession, belonging to said first party, on its accounts.

Fifth. Immediately after the purchase of every account hereunder, said first party shall make upon its book an entry showing the absolute sale of said accounts to said second party, and said second party is hereby given the right and privilege of auditing the books, accounts and records of said first party, relating to said accounts, at any time that it may see fit so to do.

Sixth. Whereas it is for the mutual benefit of the parties hereto that the collection of said accounts shall in the first instance be remitted to the party of the first part and in its name; the party of the first part shall at all times appoint some person or persons mutually acceptable to both of the parties hereto, their attorney-in-fact to receive all such remittances in whatever form they may be made, and to transfer, assign and transmit all such proceeds to said party of the second part.

And said party of the first part shall immediately upon receipt of such remittances in whatever form the same shall be made, deliver the same to such attorney for transmittal to the party of the second part; and said attorney shall at all times have access to all mail received by said party of the first part and all books and records of the party of the first part, to discover what payments and remittances are made upon such accounts.

And in consideration of the execution of this agreement by the party of the second part, said party of the first part undertakes and agrees to guarantee the faithful conduct of said attorney-in-fact in the receipt, assignment and transmittal of all such payments or remittances.  And upon the like consideration said party of the first part shall pay unto said attorney-in-fact compensation for all such services so rendered in that behalf; and that we will furnish and provide for said attorney-in-fact all necessary clerical or stenographic assistance for making reports

receivable and transmit them to petitioner. It was averred that $100 per month was a reasonable charge and that under the provisions of the sixth clause the Reed Company was to pay Manning, but failed to do so, and petitioner was compelled to make such payment.

The trustee filed answers contesting the principal claim on the ground that the transactions between petitioner and the bankrupt corporations did not amount to a purchase of the accounts receivable but constituted mere loans of money (with the accounts assigned as collateral

to party of the first part, and all postage or express charges for transmitting reports and remittances; said attorney-in-fact shall also have the right and power, and it shall be his duty to endorse the name of the party of the first part on any freight or express bill or bill of lading relating to said accounts; and ratifying and confirming all its said attorney may do in the premises. And said attorney-in-fact as to all such matters shall receive such moneys or other remittance solely for the party of the second part and shall at all times be subject to its exclusive orders with relation thereto; and it is now mutually agreed between the parties hereto that E. Manning shall be and continue such attorney-in-fact to perform such duties, until by mutual agreement of the parties hereto, another person shall be appointed in his stead.

Seventh. That said second party in making purchase of accounts hereunder relies upon the guaranties and covenants of said first party herein contained and upon the written representations made to it by said first party as to the financial responsibility of said first party; that said written representation heretofore made and that may hereafter be made are for the purpose of establishing the credit of said first party with said second party so that sale of accounts may be made hereunder.

Eighth. That said first party shall execute and deliver to said second party or its assigns, any document necessary or proper to carry into effect this contract and should second party employ counsel or cause legal action to be instituted to enforce the payment of any of said accounts, or any part thereof, either in its own name or of the name of the party of the first part, then and in either case said first party shall immediately pay to said second party or its assigns, all court costs, expenses, attorney's and stenographer's fees which may be by it expended in such proceedings.

In Witness Whereof, etc.

security) at usurious rates of interest, and traversing the claim for moneys paid to Manning upon grounds that will appear below. The special master to whom the matter was referred overruled the claim, sustaining the trustee's contention, and holding, in view of the agreed statement of facts submitted to him by the parties in lieu of proof, that the contracts were not sales of the accounts by the respective bankrupt corporations to petitioner, but were transfers of the accounts as security for loans; and that these loans were made at usurious rates of interest, whether the contracts were made in Indiana or Kentucky, since the amounts retained as a "service charge" under the contracts amounted to at least 24 per centum per annum on the moneys paid by the petitioner from the time of payment to the time of reimbursement, while the statutes of both States fixed six per centum per annum as the legal rate of interest, providing that any excess might be relieved against, and if paid recouped, and while the Indiana statute permitted interest up to 8% to be contracted for in writing, it provided that if over 8% were contracted for or collected, all over 6% should be forfeited. The special master therefore held that in the settlement the transactions between the petitioner and trustee should be purged of usury, and the petitioner be treated as a creditor of the bankrupt corporations with security for its debt. As to the claim for the $800 paid by, petitioner to Manning, the special master overruled this upon the ground that there was nothing to show what services, if any, were rendered by Manning as attorney in fact during the time from March 16, 1912, to November 12, 1912. It appeared that during the continuance of the contracts between the petitioner and the Chair Company and the Reed Company respectively, Manning was an officer and employé of the respective companies; that for all services rendered by him while so employed by these companies, including such as he

rendered as attorney in fact, he was to receive a regular salary, which was paid to him by the Chair Company until the business was taken over by the Reed Company, and then by it until April 9, 1912, when the custodian took charge of the bankrupts' estates, with the exception of salary for the two weeks ending April 9, which was owing to him from the Reed Company; that from April 9 to September 9, 1912, Manning was in the employ of the custodian as clerk, and thereafter in the employ of the trustee in the same capacity, and his salary for this employment had been paid him out of the bankrupts' estates. The special master also overruled a claim made by petitioner for allowance of its counsel fee in the same proceedings. The demand for such allowance was based upon the eighth clause of the agreement, which it was contended was broad enough to embrace not only counsel fees incurred in the collection of accounts receivable from delinquent debtors or customers of the Chair Company or the Reed Company, but also counsel fees incurred by petitioner in collecting directly from either of those companies any accounts receivable which had come into its hands and for which it or its trustee in bankruptcy failed to account.

Thereupon the special master stated an account between the petitioner and the bankrupts' estates, making the proper allowances for the usury, finding a balance of only $576.10 due from the trustee to the petitioner, and recommending that this be ordered paid over, but only upon condition that the petitioner turn over or account to the trustee for the contracts of March 6, 1911, and November 9, 1911, and any uncollected accounts or papers connected with the uncollected accounts delivered to it under those contracts.

Petitioner's exceptions to this report were overruled by the District Court (206 Fed. Rep. 309), and a decree was entered in accordance with the recommendations of

the special master.  The Circuit Court of Appeals affirmed the decree. 210 Fed. Rep. 893.

Upon the present appeal it is insisted that there was error in holding that petitioner and appellant, by virtue of the contracts between it and the bankrupts and the transactions and conduct of the parties, did not become the purchaser or owner of the accounts receivable in question, and that the transactions were really loans, with the accounts receivable transferred as collateral security. But it seems to us so entirely clear that the conclusions reached by the special master and approved by both courts were correct that we deem it unnecessary to discuss the matter at any length. To quote from the opinion of the District Court: "The considerations which support this conclusion are that the bankrupts were to and did collect the accounts and bear all expense in connection with their collection; what is claimed to have been the purchase price for the accounts, to-wit: the difference between the face of the accounts and the discount, was not known until payment of the account and receipt thereof by the Company and then depended on the time that had elapsed since the date of the advance of the seventy-five per cent; what is claimed to have been deferred payment of the purchase price was simply a return to the bankrupt of the excess of the collection over and above the advance and discount; and the provision that, in the event of non-payment of any of the accounts at maturity or the debtor becoming insolvent, the bankrupt should repurchase the account and pay therefor the advance made thereupon plus the discount. . . . In so far as the contracts in question here use words fit for a contract of purchase they are mere shams and devices to cover loans of money at usurious rates of interest. That the company was not adverse to the use of shams is otherwise apparent from the use by it of the word 'service,' in its dealings with the bankrupts under the con-

tracts, to characterize the discounts. In any view of the contracts those discounts were not charges for services rendered the bankrupts. Loans are never regarded as services."

*Houghton* v. *Burden,* 228 U. S. 161, affirming *In re Canfield,* 193 Fed. Rep. 934, is plainly distinguishable, for there the contract contemplated actual services by the lender, and this provision was found not to have been a mere cover for usury.

The rulings adverse to the claim for moneys paid to Manning and for counsel fees in the proceedings are so manifestly correct as to require no discussion.

*Decree affirmed.*