SOUTHEASTERN FINANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 601.   Promulgated March 31, 1945.

1070

*Herbert D. Cohen, Esq.*, for the petitioner.
*Bernard D. Hathcock, Esq.*, for the respondent.

1078

OPINION.

*Issue 1.*

TYSON, *Judge*: It is not disputed that petitioner qualifies as a personal holding company for the taxable years insofar as its stock ownership is involved under section 501 (a) of the Internal Revenue Code.[1] It is also undisputed that that portion of its gross income

---

[1] SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

derived from "charges" collected on conditional sales contracts and notes received by it from its dealers, if added to the portion of its gross income admittedly derived from interest, meets the gross income percentage requirement of said section if such "charges" constitute interest within the meaning of section 502 (a) of the code.[2] The first issue therefore is whether such "charges" are interest within the meaning of section 502 (a), *supra*.

The respondent contends that petitioner's income derived from such "charges" constituted interest on loans made by it to the dealers, which loans were secured by the conditional sales contracts and notes of the dealers' customers as collateral. This is denied by petitioner, which contends that it purchased the contracts and notes and that the income derived from the "charges" collected thereon was gain derived from the purchase and liquidation thereof rather than interest on loans collaterally secured by such contracts and notes. The problem thus involves determining whether the transactions between petitioner and the dealers evidenced sales by the dealers to petitioner of the contracts and notes or whether they were received and held by petitioner as collateral security for loans made by it to the dealers.

The contracts of the petitioner with the dealers (hereinafter sometimes referred to as the covering contracts) under which petitioner received the conditional sales contracts and notes contained provisions as follows: That petitioner would discount the paper received from the dealers and advance thereon 100 percent of the unmatured installments, of which 70 percent of the net amount thereof less the compensation "for all services and other considerations" to be rendered by petitioner was to be paid in cash upon acceptance of the paper; that the remaining 30 percent less any deductions and plus any interest paid by the respective original debtors should in the case of each installment be paid to the dealers on the tenth day of the month following payment of such installment, except that no payments of any such remainder were required to be made by petitioner to the dealers so long as any paper discounted was in any manner affected by breach of any warranty of the dealer, including the warranty that each installment be paid when due, but such remainder might be held by petitioner and thereafter applied to the payment of any paper with regard to which the warranty of the dealers had been breached; that payment in cash of all the paper discounted and all the installments thereof in full at maturity was warranted by the dealers; that if a debtor failed to pay an installment at maturity or made an assignment for the benefit

---

[2] SEC. 502. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this subchapter the term "personal holding company income" means the portion of the gross income which consists of:

(a) Dividends, interest (other than interest constituting rent as defined in subsection (g), royalties (other than mineral, oil, or gas royalties), annuities.

of creditors the dealers would, upon demand, repurchase from petitioner such defaulted paper and pay the entire unpaid balance thereof after certain adjustments; and that if the dealers failed to repurchase such defaulted paper within ten days after such demand, and in certain other eventualities, such as a dealer becoming insolvent, etc., then the dealers would, on demand, repurchase from petitioner all of the discounted paper, paying the aggregate unpaid principal amount thereof after certain adjustments, and in case such demand was not complied with in ten days the petitioner might after ten days notice sell or assign the paper and apply the net proceeds against the amounts owing to the petitioner, any deficiency resulting therefrom to be paid by the dealers and the dealers being entitled to any surplus.

The transactions between petitioner and the dealers were carried on in compliance with the covering contract. The petitioner made the initial advances of 70 percent, less its charges, upon acceptance of the paper and made payment of the remaining 30 percent of installments on the tenth of the month following that in which collections of the installments were made and not until after such collection.

We think the above enumerated provisions of the contract and the conduct of the parties thereunder are controlling as to the character of the transactions between petitioner and the dealers, and it is our opinion that those transactions by which the paper in question was received by petitioner from the dealers constituted loans collaterally secured by the paper, and not a sale of such paper, as is contended by petitioner. This would seem to be so clear as to need no further comment, under the authority of *National Trust & Credit Co.* v. *Orcutt & Son Co.*, 259 Fed. 830; *National Discount Co.* v. *Evans*, 272 Fed. 570; *Sponge Exchange Bank* v. *Commercial Credit Co.*, 263 Fed. 20; *Le Sueur* v. *Manufacturers' Finance Co.*, 285 Fed. 490; *Brierley* v. *Commercial Credit Co.*, 43 Fed. (2d) 730, affirming 43 Fed. (2d) 724; *In re Gotham Can Co.*, 48 Fed. (2d) 540; Cf. *Home Bond Co.* v. *McChesney*, 239 U. S. 568; and *Commercial Security Co.* v. *Holcombe*, 262 Fed. 657, in which cases transactions similar in all material respects to the ones here involved were held to be loans rather than sales.

While most of the cited cases considered the question of whether the transactions involved represented sales or loans as such question related to whether or not certain amounts charged on sums paid for paper or accounts constituted usury, it can be said here, as was said in *Gotham Can Co., supra*, in which case there was no question of usury, but merely a question of whether certain transactions constituted sales of accounts or collateral loans: "In decisions construing usury statutes contracts of this kind have uniformly been held to be collateral loans. We see no reason to give them any other interpretation here."

The provisions in the contracts whereby in certain eventualities the dealers were to repurchase the paper from petitioner in no wise stamp the transactions by which the paper was received by petitioner as a sale. A contrary result follows as to such provisions when they are considered in connection with the other provisions of the contracts. *Home Bond Co.* v. *McChesney, supra; Le Sueur* v. *Manufacturers' Finance Co., supra; National Discount Co.* v. *Evans, supra;* and *Commercial Security Co.* v. *Holcombe, supra.*

*Western Acceptance Corporation,* 46 B. T. A. 828, upon which petitioner relies as on "all fours" with the instant case is distinguishable, *inter alia,* in that the finance company in that case, upon receipt of the conditional sales contracts, paid the dealer the full cash price of the car and acquired the dealer's contract with the dealer's customer, purchaser of the car, who was to pay a greater amount than the full cash price of the car in periodic installments. The dealer was never to receive anything further than the initial cash payment made by the finance company. Here, the petitioner advanced to the dealers only 70 percent of the face value of the installment notes, less petitioner's charges, while the balance of 30´ percent was to be, and was, paid to the dealers only after the collection of the notes from the original makers thereof. The fact that part of an amount agreed to be paid for conditional sales contracts is to be paid only after collections of the amounts due on such contracts are made has been considered as an important factor by the courts in determining whether a transaction is a loan or a sale. In *Home Bond Co.* v. *McChesney,* 239 U. S. 568, 575, where accounts receivable were transferred to a finance company under a contract providing for the payment in cash, at the time of the transfer, of a certain percentage of the face value of the accounts and for payments of the balance of their face value only after the collection of the accounts, the court in enumerating the factors which supported its conclusion that the transactions were really loans with the accounts receivable transferred as collateral security, stated, as one of the determining factors, the following: "What is claimed to have been deferred payment of the purchase price was simply a return to the bankrupt [transferor of the accounts] of the excess of the collection over and above the advance and discount; * * *." In *Sponge Exchange Bank* v. *Commercial Credit Co., supra,* a bank under a contract with a credit company agreed to transfer by endorsement to the credit company certain notes which had been transferred through endorsement to the bank by a supply company. These notes represented accounts which were due the supply company from its customers and had been executed by the customers to the supply company as payee. The credit company agreed to pay the bank 100 percent of the face amount of the notes, of which

77 percent was to be advanced in cash upon acceptance of the notes by the credit company and the remaining 23 percent, less certain adjustments, was to be paid the bank immediately upon payment by the makers of such notes to the credit company. The court, in holding that the arrangement constituted a loan and not a sale, said:

The collection by the credit company of the amount called for by a note so acquired would not entitle it to retain that amount if it exceeded the sum of the advance, or advances [77%] * * *. The acquisition by the credit company of a note in the manner provided for was essentially different from a purchase. That there was no sale follows from the fact that the endorsing payee was not divested of ownership. Neither the bank nor the credit company became entitled as owner to the amount paid in satisfaction of a note. * * * When by the terms of a transaction by which an endorsee acquires a note he is required to pay, or account, to the endorser for, so much of what is collected on it as is in excess of an amount advanced * * * the transaction is not the sale of a note and the endorsee is not the buyer of it.

See also *National Trust & Credit Co.* v. *Orcutt & Son Co.*, *supra;* *Brierley* v. *Commercial Credit Co.*, *supra; Commercial Security Co.* v. *Holcombe*, *supra;* and *In re Gotham Can Co.*, *supra.* We think the authorities above cited establish the principle that where, as here, part of the amounts paid for accounts or paper is to be paid only after such accounts, or papers, are collected, such factor is a vital one in determining whether the transaction constituted a loan or a sale; and that the presence of such a factor in this case and the absence thereof in the *Western Acceptance Co.* case clearly distinguish the two cases.

The other cases cited by petitioner are not apposite.

Since the filing of the briefs in this case this Court has decided the case of *Elk Discount Corporation*, 4 T. C. 196, and the holding in that case is also distinguishable from the instant case in the same manner as is the *Western Acceptance Co.* case.

Having decided that the transactions here involved constituted loans, the question remains of whether the amounts received by petitioner as compensation for such loans constitute interest in whole or in part.

Paragraph fourth of the Maxwell Co. contract provides that petitioner should receive, as its total compensation for the rendering of all services and other considerations, an amount equal to 1.2 percent per month of the net balance scheduled to become due on the paper each month. Corresponding provisions of the contracts with the other dealers differ with this paragraph only as to the rate of compensation, those other contracts providing compensation of 8 percent of the net face amount of the paper from the date of its acquisition to the date of payment.

Under paragraph third of the Maxwell Co. contract and under the agreements with the other dealers containing like provisions, peti-

tioner agreed to perform certain services, among others being to "place its collection department at disposal of the first party [the dealers] and endeavor to collect from debtors any paper discounted hereunder." The facts show that of the services enumerated in paragraph third of the Maxwell Co. contract and the other contracts the only substantial service rendered by petitioner was the collection of installments when a debtor did not insist on making his payments direct to the dealer. Assuming, without deciding, that the cost, or value, of such rendered services would not constitute interest, such fact would be of no avail to petitioner, since nowhere in the record is such cost, or value, shown. Only the total amount of the charges of 1.2 percent made and received by petitioner in the case of paper received by it under the Maxwell Co. contract and the total charges of 8 percent made and received by it under its contracts with the other dealers are shown and no allocation is shown as between the cost, or value, of petitioner's services for collection of the paper and amounts received by it as "other considerations" for making the advances. It is obvious that such "other considerations" constitute interest or compensation paid by the dealers for the use of petitioner's money. As was aptly stated in *Brierley* v. *Commercial Credit Co.*, 43 Fed. (2d) 724, 727; affd. (C. C. A., 3d Cir.), 43 Fed. (2d) 730, "What it [dealers here] paid for the accommodation of getting the money from the credit company, [petitioner here] instead of having to wait to collect it from its customers, was really interest  *  *  *."

On cross-examination, petitioner's president, when asked a question as to what "charges" were attributable to services rendered by the petitioner under its contracts, at first made no responsive answer to the question, but, instead, answered: "It isn't the cost of the services rendered, but the value of the services rendered." Upon insistence that the question be answered he said: "All of our cost of operation was reflected in the returns." The returns for both years involved show deductions claimed as to certain items in a lump sum for each item, such as for "compensation of officers," "salaries and wages," "rent," "taxes," "interest," "and other deductions authorized by law." These entries on the returns afford no information upon which the cost or value of any services rendered by petitioner under its contracts could be determined. There being nothing in the record upon which we could determine the cost or value of such "services" as were rendered by petitioner under its contracts with the dealers, we hold, even on the assumption stated above, that the entire amount received by petitioner under those contracts constituted interest and that the respondent did not err in determining petitioner to be a personal holding company and taxing it as such. Cf. *Noteman* v. *Welch*, 108 Fed. (2d) 206; and *Seaboard Small Loan Corporation*, 42 B. T. A. 715.

## Issue 2.

In consequence of petitioner being a personal holding company in the taxable years and failing to file timely personal holding company returns for those years, the next issue is the question of whether petitioner is liable for the statutory penalty imposed for such failure under section 291 of the Internal Revenue Code. It is so liable under this section unless its failure is shown to have been "due to reasonable cause and not due to wilful neglect."

Petitioner urges that there was no negligence on its part in failing to timely file a personal holding company tax return, because it "had no knowledge of the fact it might be held a personal holding company until it was so advised by its accountant in December 1941 * * * and that upon being advised of the fact * * * it immediately filed personal holding company returns for the two years in question." The petitioner does not specifically urge that the failure to timely file the return was due to reasonable cause.

The most that can be said of the evidence introduced to show that petitioner's failure to timely file the returns was "due to reasonable cause" is that, shortly prior to December 13, 1941, the president and general manager of petitioner first had his attention called, by petitioner's accountant, to the fact that petitioner might be held to be a personal holding company. There is no evidence that petitioner prior to that time had sought advice, official or otherwise, as to whether or not it was a personal holding company. Under the circumstances, even though it be assumed that petitioner's officers were innocently mistaken as to the necessity for timely filing personal holding company returns, we nevertheless think that its delay in filing such returns is not shown to have been "due to reasonable cause," and we can not, therefore, hold that the penalty was improperly imposed; and this is so even if it might be said that the liability of petitioner for personal holding company tax was "by no means clear" at the times of its failures to timely file its personal holding company returns. *West Side Tennis Club* v. *Commissioner*, 111 Fed. (2d) 6, 9; *Sabatini* v. *Commissioner*, 98 Fed. (2d) 753; *Fides* v. *Commissioner*, 137 Fed. (2d) 731, affirming 47 B. T. A. 280; *R. Simpson & Co.*, 44 B. T. A. 498, and authorities cited therein; and *Seaboard Small Loan Corporation*, *supra*. We hold as to the second issue that respondent did not err in imposing the penalties for the taxable years, except, as conceded by him, the penalty for the taxable year ended August 31, 1941, should be computed at the rate of 5 percent rather than at the rate of 25 percent as specified in the deficiency notice.

## Issue 3.

The third issue is whether the petitioner is entitled to deductions of $2,567.92 for the fiscal year ended August 31, 1940, and $9,830.92 for the fiscal year ended August 31, 1941, as additions to a reserve for bad debts, under section 23 (k) of the Internal Revenue Code.

The petitioner began business at the end of March 1940, and after operating five months, or up to August 31, 1940, it had discounted notes and conditional sales contracts for dealers of the face amount of $282,074.92 and had made direct loans, secured and unsecured, of $64,309.11. The amount of both classes of accounts outstanding at August 31, 1940, was $256,792, of which $37,059.23 consisted of direct loans. The petitioner's president and general manager estimated that 1 percent of this amount would be adequate to take care of possible losses on the outstanding accounts, and set up and deducted on the return for the fiscal year ended August 31, 1940, the sum of $2,567.92 as the petitioner's initial reserve. The respondent disallowed the deduction in its entirety on the ground that it was excessive.

The evidence shows that in the course of the petitioner's business some makers of the discounted notes and conditional sales contracts did default on their obligations, and, although the petitioner was entitled under its contracts with the dealers to reimbursement for losses resulting from such defaults and had the right to repossess the merchandise sold, we think that it was reasonable for the petitioner to anticipate losses on business of this character as well as on the direct loans. The amount of $2,567.92 does not seem to us to be an unreasonable estimate of possible losses on business of the volume shown by this record, and the reasonableness of that amount as an initial reserve is corroborated by the loss of $3,020. 87 which was actually sustained by the petitioner in the ordinary course of its business in the following fiscal year, when the demand notes of Milton Properties, Inc., in that amount became valueless by reason of the foreclosure of its hotel property and that company was left without any assets and was indebted to the United States for $6,800 income taxes. In cases of this kind there must be clear proof that the action of the respondent is unreasonable. *C. P. Ford & Co.*, 28 B. T. A. 156; *Walter H. Goodrich & Co.*, 40 B. T. A. 960; *Apex Brewing Co.*, 40 B. T. A. 1110. We think that respondent's action in not allowing any deduction for a reserve is unreasonable, and, on the facts here shown, we conclude that the deduction claimed by the petitioner for the fiscal year ended August 31, 1940, is fair and reasonable and should be allowed.

With respect to the following year, the fiscal year ended August 31, 1941, the evidence shows a great increase in the volume of business transacted by the petitioner and in the accounts outstanding at the close of the year. The direct loans made during the year were $375,-786.13 as against $64,309.11 during the preceding year, and the direct loans outstanding increased from $37,059.23 at the beginning of the year to $215,669.44 at the close of the year. The evidence does not show the total amount of paper discounted during the year, but the petitioner's income tax return discloses that at the close of the year the petitioner's outstanding accounts receivable amounted to $717,-808.07. In other words, the petitioner's outstanding accounts had increased during the year to the extent of over $460,000. We think that the recited facts justified an addition to the reserve in the amount of $9,830.92, and that the petitioner is entitled to a deduction of that amount for the fiscal year ended August 31, 1941.

### *Issue 4.*

The fourth issue arose as a consequence of respondent's disallowance of petitioner's addition of $2,567.92 to its reserve for bad debts in the taxable year ended August 31, 1940, which addition to reserve we have sustained as reasonable under the third issue.

Respondent's disallowance of such addition to reserve eliminated it as a deduction from gross income in that year and converted the net loss of $739.92 reported by petitioner into a net income of $1,828. In consequence of the foregoing, respondent also disallowed the "net operating loss deduction" of $739.92 claimed by petitioner in its return for the taxable year ended August 31, 1941. As we have found under the third issue that the $2,567.92 addition to reserve for bad debts should have been allowed, that amount was properly deductible from gross income for the taxable year ended August 31, 1940, with the result that petitioner had an excess of deductions over gross income of $739.92 for that year, which amount it was entitled to deduct from its gross income for the taxable year ended August 31, 1941, as a net operating loss carry-over. Secs. 23 '(s) and 122, I. R. C. We hold that respondent erred in denying that deduction.

### *Issue 5.*

The fifth issue presented involves petitioner's contention that it is entitled to an additional excess profits tax credit of $35.50 for the fiscal year ended August 31, 1941, by reason of a claimed addition to invested capital in that year of $2,000 for a period of 81 days.

Section 201 of the "Second Revenue Act of 1940" added a new subchapter to the Internal Revenue Code providing for an excess profits tax on certain corporations. Section 727 (e) of the Internal Revenue Code,[3] as thus amended, exempts personal holding companies from excess profits tax. We have determined under the first issue herein that petitioner was a personal holding company in the year involved. The fifth issue, involving the determination of an excess profits tax on petitioner, consequently presents a moot question and has become immaterial.

### Issue 6.

Since we have held that petitioner is a personal holding company, we shall now consider, for the purpose of ascertaining the amount of its net income subject to personal holding company surtax for the fiscal year ended August 31, 1941, the sixth issue, which involves the computation of petitioner's "dividends paid credit."

Under section 27 (a) of the Internal Revenue Code, as operative during the taxable years, one of the components of the "dividends paid credit" is a corporation's "basic surtax credit" which as defined in section 27 (b) (1) includes "The dividends paid during the taxable year." Section 27 (f) provides that in computing the basic surtax credit the dividends paid include stock dividends which are a "taxable dividend in the hands of shareholders under section 115 (f)."[4]

Petitioner contends that all of the $3,400 dividend declared on March 1, 1941, and paid during the fiscal year ended August 31, 1941, should be included in its "dividends paid credit" instead of only the amount of $400 thereof, as allowed by respondent, and it further contends that the entire dividend of $20,400 declared and paid August 25, 1941, no part of which was allowed by respondent as a "dividends paid credit,"

---

[3] SEC. 727. EXEMPT CORPORATIONS.

The following corporations shall be exempt from the tax imposed by this subchapter:
* * * * * * *
(e) Personal-holding companies, as defined in section 501.

[4] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(f) STOCK DIVIDENDS.—

(1) GENERAL RULE.—A distribution made by a corporation to its shareholders in its stock or in rights to acquire its stock shall not be treated as a dividend to the extent that it does not constitute income to the shareholder within the meaning of the Sixteenth Amendment to the Constitution.

(2) ELECTION OF SHAREHOLDERS AS TO MEDIUM OF PAYMENT.—Whenever a distribution by a corporation is, at the election of any of the shareholders (whether exercised before or after the declaration thereof), payable either (A) in its stock or in rights to acquire its stock, of a class which if distributed without election would be exempt from tax under paragraph (1), or (B) in money or any other property (including its stock or in rights to acquire its stock, of a class which if distributed without election would not be exempt from tax under paragraph (1)), then the distribution shall constitute a taxable dividend in the hands of all shareholders, regardless of the medium in which paid.

should be so allowed. Was the $3,000 paid in stock on the dividend declared March 1, 1941, a taxable dividend in the hands of the stockholders? The answer to the question depends on whether or not the shareholders had an election under section 115 (f) (2), *supra*, as to the medium in which the dividends were to be paid, i. e., whether in its stock or in money.

This dividend was paid pursuant to a resolution which provided in part "that the same be payable in cash or stock of the corporation. * * * the same to be paid from the surplus of the corporation or in capital stock of the corporation." One shareholder requested, and was paid, his dividend in cash, amounting to $400. Respondent allowed this as a deduction. The remaining shareholders requested, and were paid, their dividends in stock in the amount of $3,000, which amount respondent has not allowed as a deduction. It is obvious from the mere statement of these facts that the shareholders had and exercised their election "after" the "declaration" of the "distribution," in strict conformity with the terms of section 115 (f) (2), *supra*. This being true, the $3,000 paid in stock on the first dividend was a taxable dividend in the hands of the shareholders and should be included as dividends paid in computing the basic surtax credit for the purpose of determining petitioner's dividends paid credit. Cf. *Capital Estates, Inc.*, 46 B. T. A. 986.

As to the dividend declared August 25, 1941, the resolution specifically provided that "the same be payable in stock of the corporation." No provision was made for payment in cash or for an election to receive cash. The entire dividend of $20,400 was declared and on the same day paid as a stock dividend. At all times petitioner had only one class of stock outstanding and that was common stock. That stock dividend consequently was not taxable to the shareholders receiving it, section 115 (f) (1), *supra*, and *Eisner* v. *Macomber*, 252 U. S. 189; *Helvering* v. *Griffiths*, 318 U. S. 371; *Helvering* v. *Sprouse*, 318 U. S. 604, and is therefore not to be included as dividends paid in computing the basic surtax credit for the purpose of determining petitioner's dividends paid credit. Sec. 27 (i), I. R. C.[5] The action of the respondent with respect thereto is sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[5] SEC. 27. CORPORATION DIVIDENDS PAID CREDIT.

(i) NONTAXABLE DISTRIBUTIONS.—If any part of a distribution (including stock dividends and stock rights) is not a taxable dividend in the hands of such of the shareholders as are subject to taxation under this chapter for the period in which the distribution is made, such part shall not be included in computing the basic surtax credit.