Industrial Credit Co., Inc. v. Commissioner.
Industrial Credit Co. v. Commissioner
Docket No. 3909-65.
United States Tax Court
T.C. Memo 1967-75; 1967 Tax Ct. Memo LEXIS 185; 26 T.C.M. (CCH) 377; T.C.M. (RIA) 67075; April 11, 1967
Peter Meloy, 555 Fuller Ave., Helena, Mont., John R. Kline, and J. Patrick Giblin, for the petitioner. Walter John Howard, Jr., for respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies against the petitioner: Year
Deficiency
1960
$ 1,818.50
1961
10,491.86
1962
8,098.65
Petitioner has conceded that for each of the years 1960, 1961, and 1962 the dealer's reserve, the loan to Donald Douma, and unearned income should not be included in the accounts receivable for the application of the percentage of additions to the reserve for bad debts. The only issue for decision is whether the petitioner is entitled to deductions it claimed for additions to a reserve for bad debts for *186 the years 1960, 1961, and 1962. Findings of Fact Some of the facts have been stipulated and are found accordingly. Industrial Credit Co., Inc. (hereinafter called petitioner) is a corporation organized and existing under the laws of Montana. Now and at the time the petition was filed in this proceeding, the petitioner's principal place of business was in Billings, Montana. The petitioner was incorporated in 1958 for the purpose of engaging in the financing of industrial machinery, particularly road building equipment. The petitioner has elected to maintain a reserve for bad debts and make additions to the reserve in accordance with section 166(c) of the Internal Revenue Code of 1954. The petitioner filed Federal corporation income tax returns showing the following amounts as outstanding contracts receivable for the calendar years ended December 31, 1960, 1961, and 1962: Amount
12/31/60
12/31/61
12/31/62
Capital loaned out
$1,071,171.80
$1,296,608.13
$1,728,281.48
Dealer's reserve
500.00
2,256.00
1,574.00
Loan to Donald Douma
13,221.14
11,562.19
10,564.54
Unearned income
157,990.14
182,483.85
229,314.22
Total Installment Loan Contracts
$1,242,883.08
$1,492,910.17
$1,969,734.24
Receivable
*187 Petitioner's outstanding contracts receivable for the years ended December 31, 1958, and 1959 were $564,705.22 and $1,040,833.56, respectively. In 1960 petitioner made additions to its reserve for bad debts of $6,061.98; in 1961, $22,549.81; and in 1962, $18,953.07. The same amounts were deducted in the respective years as additions to the reserve for bad debts on petitioner's Federal income tax returns. Petitioner's reserve for bad debts was maintained for 1960 at the rate of 3 percent of its total loan contracts receivable, and for the years 1961 and 1962 at the rate of 4 percent of its total loan contracts receivable. At the end of the calendar year 1960, petitioner's books reflected a reserve for bad debts amounting to $37,286.49; in 1961, $59,836.30; and in 1962, $78,789.37. The respondent disallowed the petitioner's addition to its reserve for bad debts in the years ended December 31, 1960, 1961, and 1962. This then left petitioner with a reserve for bad debts in each of these years of $31,224.51, which is the same as it had on December 31, 1959. The ratio of the serve for bad debts to the outstanding contracts receivable, according to the respondent, in the years before *188 the Court, is as follows: Outstanding
Year
Contracts
Percent or
Ending
Receivable
Ratio
12/31/60
$1,071,171.80
2.9%
12/31/61
1,296,608.13
2.4
12/31/62
1,728,281.48
1.8
A substantial amount of the dollar volume of the outstanding contracts of petitioner are concentrated in one industry, i.e., construction, and the loans were made to finance the purchase of construction equipment. The following schedule shows the various business classifications in which petitioner's loans were made. The schedule shows the outstanding loans at the end of each year in controversy: 12/31/60
Average Loan
Industry
Amount
Percent
Balance
Construction Equipment
$ 798,204.41
64.2%
$16,629.26
Sawmill and Logging Equipment
221,949.19
17.9%
13,871.82
Concrete and Ready Mix Equipment
135,799.62
10.9%
8,487.48
Automotive Equipment
73,708.72
5.9%
12,284.78
Other
13,221.14
1.1%
13,221.14
Total
$1,242,883.08
100.0%
Average Loan Balance
$14,826.01
12/31/61
Construction Equipment
$ 951,164.70
63.7%
$17,293.72
Sawmill and Logging Equipment
171,662.82
11.5%
9,536.82
Concrete and Ready Mix Equipment
250,104.17
16.7%
27,736.74
Automotive Equipment
101,488.80
6.8%
14,498.40
Other
18,489.68
1.3%
2,641.38
Total
$1,492,910.17
100.0%
Average Loan Balance
$15,233.78
12/31/62
Construction Equipment
$1,133,858.80
57.5%
$20,247.48
Sawmill and Logging Equipment
121,768.29
6.2%
7,610.52
Concrete and Ready Mix Equipment
304,690.92
15.5%
30,469.09
Automotive Equipment
157,965.35
8.0%
15,796.53
Aircraft
221,721.56
11.3%
24,635.73
Other
29,602.66
1.5%
3,700.33
Total
$1,969,607.58
100.0%
Average Loan Balance
$18,070.96
*189 The petitioner has had two charges against the reserve for bad debts. The first was in 1963 of $15,432.12, and the second in 1964 of $200. The 1963 charge against the bad debt reserve resulted from a loss on the Mel Buck loan. Mel Buck was a building contractor who in 1961 was engaged in building The College of Great Falls, Great Falls, Montana. On February 21, 1961, a loan in the amount of $60,000 was made to Mel Buck. An additional loan was made to Mel Buck on June 14, 1961, of $8,000. Later in 1961 Mel Buck experienced misfortune on The College of Great Falls project, and it looked as if he would suffer a large financial loss. On December 18, 1961, the final payment was made by Mel Buck and this left a balance due of principal and interest of $69,178.60. Mel Buck's bonding company became concerned about whether he would be able to complete The College of Great Falls project. All of Mel Buck's major construction equipment was mortgaged to petitioner, and the bonding company was fearful that petitioner would foreclose, leaving Mel Buck without any equipment. The bonding company filed a suit against petitioner in which it claimed that under the indemnity agreement signed by Mel Buck, *190 it had a prior lien on the equipment mortgaged to the petitioner. The case was settled in 1963. Thereafter, equipment which secured the loan was sold by the petitioner and a partial recovery was made. In 1963, an amount of $15,432.12 was charged against the reserve for bad debts as the loss on the Mel Buck loan. The 1964 charge against the reserve for bad debt resulted from a $200 bad check which petitioner accepted. The petitioner sold a pickup truck for $900, and accepted a $200 check as down payment. The check never cleared the bank. Possession of the truck had been retained and it was subsequently sold for $700 resulting in a loss of $200. The petitioner has two sources for the money which it loans out, other than the contributed capital. First, part of it is borrowed from debenture holders and, secondly, from commercial banks. In borrowing from commercial banks, petitioner executes a 6-month promissory note and pledges receivables from its customers as security. The commercial banks loan petitioner up to 80 percent of the face value of the receivables or contracts that are pledged as collateral. The loan agreement with the bank requires petitioner to replace the collateral *191 or pay the promissory note in the event that the pledged security becomes 90 days or more past due. The banks also require the petitioner to leave 15 percent of the loan in a checking account at the bank as a compensating balance. The following is a schedule showing, on December 31, 1960, 1961, and 1962, the commercial bank lines of credit available to the petitioner, the maximum loan available, and the required 15 percent compensating balance: Column #2
Column #3
Column #4
Column #1
Loan
Minimum
15% of
Pledged
(Maximum
of 20%
Loan as
Collateral
of 80%
of
Compensating
December 31, 1960
100%
Collateral)
Collateral
Balance
Commerce Bank & Trust Co.,
Helena, Montana
$ 49,469
$ 37,221
$ 12,248
$ 5,583
First Nat'l Bank of
Billings,
Billings, Montana
241,334
196,538
44,796
29,481
Midland Bank, Billings
223,456
174,073
49,383
26,111
Union Bank & Trust Co.,
Helena, Mont.
255,614
197,926
57,688
29,689
$ 769,873
$ 605,758
$ 164,115
$ 90,864
December 31, 1961
First Nat'l Bank, Missoula
$ 57,986
$ 34,998
$ 22,988
$ 5,250
Midland Nat'l Bank,
212,409
166,352
46,057
24,953
Billings
First Nat'l Bank, Billings
295,365
217,330
78,035
32,600
Commerce Bank & Tr. Co.,
Helena
51,698
38,606
13,092
5,791
Union Bank & Trust Co.,
Helena
265,058
165,000
100,058
24,750
Conrad Nat'l Bank,
68,245
48,396
19,849
7,259
Kalispell
$ 950,761
$ 670,682
$ 280,079
$ 100,603
December 31, 1962
First Nat'l Bank,
Billings, &
Northwestern Nat'l Bank,
Minneapolis
$ 459,076
$ 346,289
$ 112,787
$ 51,943
Commerce Bank & Tr. Co.,
Helena
75,362
56,408
18,954
8,461
Union Bank & Trust Co.,
Helena
242,688
190,740
51,948
28,611
Midland Bank, Billings
295,402
200,000
95,402
30,000
Conrad Nat'l Bank,
121,685
91,043
30,642
13,656
Kalispell
First Nat'l Bank, Missoula
69,494
50,961
18,533
7,644
First Nat'l Bank, Bozeman
8,515
5,175
3,340
776
First Nat'l Bank, Helena
121,593
83,618
37,975
12,543
Security Tr. & Savings
Bank,
Billings
101,066
78,878
22,188
11,832
First Westside Bank, Great
Falls
56,802
40,815
15,987
6,122
$1,551,683
$1,143,927
$ 407,756
$ 171,588
*192 NOTES Column #1 PLEDGED COLLATERAL 100%. This is the actual amount of the unpaid balance on the negotiable documents pledged and physically held in the banks custody on which they will loan up to 80%. Column #2 LOAN (MAXIMUM 80% OF COLLATERAL). This represents the amount the bank has advanced against the pledged collateral. For example, on $100,000 of collateral the bank would deposit to Industrial Credit Co., Inc.'s account up to $80,000. Column #3 MINIMUM OF 20% OF COLLATERAL. This is the actual net excess of the pledged collateral over the present balance of the loan. Column #4 15% OF LOAN AS COMPENSATING BALANCE. This is the minimum balance which the bank requires Industrial Credit Co., Inc., to maintain in its checking account with that bank, and is known as a "compensating balance." For example, on the above $100,000 of collateral the bank would only allow Industrial Credit Co., Inc., to withdraw $68,000. The petitioner is engaged in high risk business. There are several factors which make petitioner's business one with a high degree of risk. Petitioner's loans are concentrated in the construction industry or related areas. Loans to businesses in this industry are *193 of a more hazardous nature than most banks care to make. The loans of petitioner average about 30 months which is a longer period of time than most banks care to extend credit. Because of the weather in Montana many contractors are not able to operate during the winter months. Consequently, they have no income when not operating, so "skip" payments are arranged by petitioner which provide that the contractors will only be making loan payments during the months they are earning income. If there is an early winter the "skip" payments have to be extended. In the years 1960 and thereafter, there was a substantial increase in petitioner's nonguaranteed receivables. In 1959 the nonguaranteed receivables were 41.2 percent, but increased to 73.7 percent in 1960. A summary of petitioner's loans during 1958 through 1962, and the percentages of guaranteed and nonguaranteed receivables, are contained in the following schedule: Total with
Total Time
Total Cash
Recourse
Balances
Balances
to Dealer
Year
Purchased
Purchased
Purchased
1958
$ 738,862.57
$ 629,558.76
$ 377,119.22
1959
1,134,953.22
961,923.40
566,396.84
1960
1,174,964.08
999,133.10
262,425.24
1961
1,588,687.17
1,333,391.97
390,417.24
1962
2,264,284.27
1,941,343.54
525,674.98
$6,901,751.31
$5,865,350.77
$2,122,033.52
*194 Percent-
Percentage
age with
without
Recourse
Recourse
Total
to Dealer
to Dealer
without
Purchased
Purchased
Recourse
to Total
to Total
to Dealer
Cash
Cash
Year
Purchased
Balances
Balances
1958
$ 252,439.54
59.9%
40.1%
1959
395,526.56
58.8%
41.2%
1960
736,707.86
26.3%
73.7%
1961
942,974.73
29.3%
70.7%
1962
1,415,668.56
27.1%
72.9%
$3,743,317.25
The petitioner has few loan accounts in comparison to the total outstanding loans. The construction business to which petitioner makes its loans is extremely competitive. Consequently, the profit margins which contractors allow themselves are relatively small, and if they make only a small error in their calculations they may suffer a substantial loss, thus increasing the risk to petitioner. During 1958 to 1962, the early years of petitioner, the economy of the Nation, and more particularly that of Montana, has been on the upgrade. The highway construction industry specifically has been enjoying prosperous times because of the interstate highway construction in Montana. Intermountain Capital, Incorporated, a wholly owned subsidiary of petitioner, is *195 licensed under the Small Business Investment Act of 1958. Intermountain Capital, which was organized in 1962, is comparable to petitioner in that they are both engaged in a similar type of finance business, with comparable risks. In 1963, Intermountain Capital used a 4-percent reserve for bad debts and thereafter a 10-percent reserve for bad debts. Other institutions which are engaged in making loans are allowed the following percentages in computing a reserve for bad debts: 1. Production Credit Associations - 3.5 percent by formula. 2. Commercial banks - 2.4 percent. 3. Small Business Investment Companies - 10 percent. 4. Building and Loan Associations - 12 percent. Ultimate Findings Petitioner's additions to its reserve for bad debts for the years 1960, 1961, and 1962 were reasonable. Respondent's disallowance of petitioner's additions to its reserve for bad debts in the calendar years 1960, 1961, and 1962 was an abuse of his discretion in these circumstances. Opinion The question presented is whether the petitioner correctly increased its reserve for bad debts in the taxable years 1960, 1961, and 1962. The amount ($31,224.51) which respondent determined to be *196 an adequate reserve reflects a percentage ratio of 2.91 percent, 2.41 percent, and 1.81 percent to the respective balances of capital loaned out or true accounts receivable for the years in controversy. Petitioner computed and claimed the reserve additions at the rate of 3 percent for 1960 and 4 percent for 1961 and 1962. Section 166(c) [1] of the Internal Revenue Code of 1954 provides for the deduction of a reasonable addition to a reserve for bad debts. Under this provision a reasonable addition is that amount necessary to bring the balance in the reserve to an amount which can be reasonably expected to cover anticipated losses with respect to debts outstanding at the end of the year. See O. P. Lutz, 29 T.C. 469 (1957); Ira Handelman, 36 T.C. 560 (1961); and J. E. Hawes Corporation, 44 T.C. 705 (1965). *197 Section 1.166-4(b)(1) and (2), Income Tax Regs., provides: Sec. 1.166-4 Reserve for bad debts. * * * (b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. (2) Correction of errors in prior estimates. In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year. What constitutes a reasonable addition to a reserve for bad debts depends "upon the facts and circumstances of *198 the business engaged in with relation to general business conditions." Black Motor Co., 41 B.T.A. 300, 304 (1940), affirmed on other issues 125 F. 2d 977 (C.A. 6, 1942); see also Roanoke Vending Exchange, Inc., 40 T.C. 735, 742 (1963). The facts of this case clearly show that (1) the petitioner is engaged in a high risk financing business, (2) it has not had sufficient time in which to develop a history of actual bad debts, and (3) comparable lending institutions which have less risk are allowed a larger percentage of bad debts than petitioner has claimed. Respondent here has attempted to scamper to the safe harbor of the Commissioner's "discretion" and argues that the petitioner has not demonstrated that "respondent's determination in disallowing those additions for the years in question was arbitrary and amounted to an abuse of his discretion." While it is true that the petitioner has a double-barreled burden of proof in this type of case, which is "greater than the usual burden," see Roanoke Vending Exchange, Inc., supra, and Krim-Ko Corporation, 16 T.C. 31 (1951), it is certainly not insurmountable. The Commissioner's *199 determination can be overcome by "clear proof" that his action in reducing the addition to the reserve was unreasonable. See Southeastern Finance Co., 4 T.C. 1069 (1945), affirmed on another issue 153 F. 2d 205 (C.A. 5, 1946). We think this petitioner has satisfied its burden by "clear proof." The facts and circumstances which have caused us to reach this conclusion are discussed below. 1. The petitioner is engaged in a high risk finance business. Petitioner is engaged in the business of industrial financing and this type of business has more hazards and risks than the normal financing business. Petitioner's loans are primarily to borrowers who are connected with the construction business or related industries, viz., sawmill and logging, concrete and ready mix, and automotive equipment for use in the construction industry. For the years 1960, 1961, and 1962, the average loan balance on construction equipment was 64.2 percent, 63.7 percent, and 57.5 percent, respectively, of the total average loan balance. There is a good possibility that a contractor will underbid a project, incur a loss on the project, and thus be unable to repay the loan to petitioner. *200 This is because the construction industry, and particularly road construction, has become extremely competitive. Contractors are forced to bid very low in order to be awarded contracts that will enable them to keep their employees on the payroll and keep their expensive equipment operating. Since the industry has become so competitive, the profit margins have narrowed and a small fractional error in bidding may easily cause a substantial loss to the construction company. If the loss is more than the contractor can withstand, the business will collapse and the creditors, one of which is petitioner, will either not be paid at all or not in full. Highway construction and construction in general require mild weather. When winter sets in on Montana, the contractor is forced to shut down. When this occurs he has no income, but he uses the slack time to repair his equipment. To accommodate contractors when the cold weather forces them to halt their operations, the petitioner and other financial institutions arrange "skip" payments on the loan contracts. The contractor will be required to make payments on his obligations throughout the year except from December through April. The loan repayment *201 schedule is geared to the contractor's anticipated flow of income. This is fine as long as the weather cooperates, but if winter comes early and forces the contractor to shut down in October, he has no income in November and December. Consequently, the "skip" payments must be rearranged. Unless the spring comes early, the contractor will have two extra "skip" payments for the year, November and December, which in turn extend the period of time in which petitioner will be paid in full on the contract. The longer the loan contract is extended the greater the risk incurred by petitioner. The senior member of the accounting firm that audits the petitioner, and officers of two banks that have extended credit to the petitioner, testified as to the nature of petitioner's loans. All of them testified that there is a "high risk and high exposure" involved in these accounts. Beginning in 1960, the petitioner's receivables which were not guaranteed by dealers (i.e., those without recourse) increased substantially. In 1958, 40.1 percent of the receivables were without recourse and in 1959, 41.2 percent. However, in 1960 the percentage increased considerably to 73.7 percent; in 1961, 70.7 *202 percent; and in 1962, 72.9 percent. Thus, during the 3 years before the Court, petitioner was undertaking considerably greater risk than in the 2 preceding years because about 30 percent more of its receivables were unguaranteed. On the average, the petitioner's loans are large when compared to its reserve for bad debts. It need only experience a few losses on the outstanding loans and its reserve would be reduced to zero. 2. The petitioner has not had sufficient time to establish a past loss experience. Petitioner has operated only during proseperous times which have not given it sufficient opportunity in which to establish a loss experience. It began operations in 1958. During the years 1958 to 1962 the business cycle has been on a relatively high plane. The Nation has enjoyed good times and a rising economy. The construction industry in Montana has been favored with prosperous times during these years because of the interstate highway construction within the State. During the years 1958 to 1962 the petitioner's outstanding contracts receivable increased from $564,705.22 on December 31, 1958, to $1,969,734.24 on December 31, 1962. The healthy economy and the high level business *203 cycle during the petitioner's early years are the primary reasons that petitioner has been so fortunate in not experiencing many actual losses. Since the petitioner has been in operation only a short period of time, its past experience is not a reasonable guide in determining a proper addition to its reserve for bad debts. As this Court said in H. W. Porter & Co., 14 T.C. 307, 312 (1950), reversed on another issue 187 F. 2d 939: It is not reasonable to suppose, as repondent would have us do, that the multiple increase in petitioner's volume of business during the war years would be unaccompanied by an increase in the amount of bad debts. Southeastern Finance Co., 4 T.C. 1069; affirmed on another point, 153 Fed. (2d) 205. And, under the circumstances prevailing during that period, past experience with less business volume loses its normal value as an index to the reasonableness of an addition to reserves. * * * 3. Lending institutions that encounter less risk than the petitioner are allowed reserves for bad debts using larger percentages of the outstanding loans than petitioner has been allowed by respondent. One of petitioner's *204 sources of funds is from commercial banks. Petitioner must pledge collateral to acquire a loan and then may only borrow up to 80 percent of the value of the security. Furthermore, the petitioner must leave 15 percent of the loan on balance with the bank as a compensating balance. Assuming petitioner would pledge $100,000 of collateral to a commercial bank, it could borrow up to $80,000 on the security. Since petitioner would be required to leave 15 percent of the $80,000, or $12,000, with the bank as a compensating balance, the petitioner is in effect only borrowing $68,000 on $100,000 worth of collateral. The bank has a $32,000 ($100,000-$68,000) reserve against the loan plus its regular reserve for bad debts which is a maximum of 2.4 percent of the outstanding loans. On a $80,000 loan the bank would have a reserve of approximately $34,000. On the same contract the petitioner would have loaned $100,000. Its reserve would be 3 or 4 percent of the loan or, as the respondent contends, 1.8 to 2.9 percent. Its reserve would be between $1,800 and $4,000. In either event, petitioner's reserve would be considerably less than that of the bank. Moreover, the petitioner's claim on the security *205 is subordinated to the bank's claim, and the bank may require a replacement of the collateral if it becomes 90 days or more past due. In addition to the bank's disproportionately larger reserve on the same loan, the bank's claim is superior to petitioner's and the petitioner will be left with the less desirable past due collateral. The petitioner owns a subsidiary, Intermountain Capital, which is licensed under the Small Business Investment Act of 1958. The testimony establishes that both corporations are engaged in the finance business and have similar risks. However, Intermountain Capital is allowed a reserve for bad debts equal to 10 percent of its outstanding loans. The combination of a formula and a "facts and circumstances" test has been used by the Internal Revenue Service in regulating the bad debt reserves of Small Business Investment Companies. See Rev. Rul. 65-88, 1965-1 C.B. 112, clarifying Rev. Rul. 64-48, 1964-1 (Part 1) C.B. 104. Under the formula test, Small Business Investment Companies are allowed bad debt ceilings equal to 10 percent of their outstanding loans for a 10-year period beginning with 1959. Where an additional amount is *206 reasonable in the light of all the facts and circumstances, reserves in excess of 10 percent may be established. After 1968, the company's own loss experience must be used to determine the reasonableness of further reserve additions. Rev. Rul. 64-48 provides, in part, as follows: In allowing a flat percentage as a reasonable reserve ceiling, consideration has been given to the fact that the SBIC industry has been in existence only since 1959 and has no available bad debt loss experience of its own which would afford an adequate basis for determining reasonable bad debt reserves. There is no similar industry which could provide the SBIC industry with comparable bad debt experience data. The ten-percent ceiling was arrived at after a thorough study of the nature of the SBIC industry and the inherent risks involved in the type of loans made. The increasing amount of charge-offs under current business trends and a comparison of the principal features of the SBIC industry with those of other types of lending institutions were other factors considered. Thus, with one hand, the Commissioner has recognized the inherent risk to Intermountain Capital and allowed it a 10-percent *207 reserve for bad debts until it has a 10-year loss experience and, with the other hand, he has refused to recognize the same risk facing the petitioner, which is engaged in the same type of business as Intermountain Capital. We think the difference in treatment is not justified. Despite the unsual force given by the statute to the Commissioner's determination of a proper addition to the reserve for bad debts, a taxpayer need not accept an unreasonable determination. Nor is this Court compelled to "rubber stamp" the Commissioner's determination. Here we believe that the petitioner's claims are by a wide margin within the bounds of reason, and therefore we have found that its additions to reserves were proper. In so holding, we recognize that this is a factual question to be decided in each case after careful consideration of all relevant facts and that the reasonableness of the addition varies between classes of business and with conditions of business prosperity. We have also given weight to the expert opinions of the two bank officials who testified that a reserve for bad debts of at least 5 percent would be reasonable for a lending institution such as petitioner. Consequently, it *208 is our view that the petitioner has met his burden of showing that the Commissioner in these particular circumstances has failed to exercise his discretion reasonably. To provide for the concessions made by petitioner, Decision will be entered under Rule 50. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.↩