CENTRAL STATION SIGNALS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 13373    Promulgated June 7, 1948.

*E. S. Schweig, Esq.*, for the petitioner.
*Whitfield J. Collin, Esq.*, for the respondent.

OPINION.

HARLAN, *Judge*:* The respondent determined deficiencies in the income and excess profits taxes of petitioner for the year 1942 in the amounts of $494.77 and $1,010.54, respectively. Certain of the adjustments made by the respondent are not contested by the petitioner.

The questions presented are:

(1) Did the Commissioner err in including as borrowed invested capital, in the computation of petitioner's excess profits tax credit, certain contingent indebtedness which arose out of transactions involving the assignment of certain of petitioner's contracts with its subscribers?

(2) In making the adjustment for interest on petitioner's borrowed invested capital as provided by section 711 (a) (2) (B) of the Internal Revenue Code, did the Commissioner err in classifying as interest certain charges arising out of the transactions involving the assignment of certain of petitioner's contracts with subscribers?

(3) Did the Commissioner err in determining that it was mandatory that the petitioner, in computing its adjusted excess profits tax net income, include certain of its "alleged" indebtedness as a part of its borrowed invested capital, when, after giving effect to the adjustment for the "alleged interest" or finance factor applicable thereto, the inclusion of such indebtedness would result in a tax disadvantage to the petitioner?

We find the facts to be as stipulated. Petitioner is a New York corporation, with its principal place of business located in New York City. Its income and excess profits tax return for the year 1942 was filed with the collector of internal revenue for the third district of New York.

The petitioner was organized on or about December 10, 1936 (and merged with the Central Alarm Co. on or about July 7, 1938).

Since its inception, the petitioner has been consistently engaged in the business of installing, maintaining, and operating certain signaling (sprinkler and fire alarm) apparatus and rendering services in connection therewith to its customers or subscribers.

The petitioner's relationship with its subscribers was generally covered by uniform printed contracts calling for the installation and maintenance of a signaling system necessary to relay signals to an operating central signal office maintained by the petitioner, for which a subscriber or customer agreed to pay, as rent for the system and service, a stated annual sum in advance for a period of five years.

On or about October 2, 1937, petitioner entered into an agreement with Phillips & Co. of Chicago, Illinois (hereinafter referred to as Phillips) providing for the assignment by the petitioner to Phillips of

---

*This report was adopted during the incumbency of Judge Harlan.

certain of its subscribers' contracts. Phillips agreed to pay the petitioner the face amount of the contract, less a discount factor of 1.35, representing the finance charge. This finance charge, computed on the amount actually advanced by Phillips was in the amount of 7 per cent per payment to cover five payments for four years, which amounted to an average net minimum charge of approximately 17 per cent per annum on the balance due under each contract.

The agreement between petitioner and Phillips provided that all payments under the assigned contracts were to be made by subscribers to Phillips; that if, at any time during the period of lease, petitioner desired to repurchase one or more of the assigned contracts, Phillips would reassign such contracts upon receipt of the amount of the unpaid payments, allowing a discount on all such unpaid payments at the rate of 8 per cent per annum; that petitioner should guarantee the prompt payment of all amounts due under the contracts; that, in the event of a default for a period in excess of 30 days or termination of a contract for any reason, petitioner would pay Phillips all payments then due in full, and all future payments to become due, discounted at the rate of 8 per cent per annum; and that, when the last payment had been received on any contract, Phillips would reassign the contract to petitioner and so notify the subscriber. The agreement also provided that Phillips might, in its uncontrolled discretion, pledge, hypothecate, sell, or otherwise deal with the contracts which petitioner from time to time sold or assigned to it.

Pursuant to the agreement, the petitioner assigned a number of the subscribers' contracts to Phillips, and received from that company the face value of such contracts less the discount factor of 1.35. Such assignments were evidenced by written instruments which stated that petitioner, for value received, "hereby sells, assigns, sets over, and transfers to Phillips * * * all its right, title and interest in and to that certain contract" between petitioner and the subscriber, and they contained the warrants of petitioner that the apparatus described in the contract had been installed; that it would continue to service and operate such apparatus during the term of the assignments; and that the sums unpaid under the contract would be paid to the assignee or its successors or assigns.

Upon the completion of such transactions with Phillips and upon receipt of the proceeds by petitioner, petitioner caused to be reflected on its books the amount so received, plus the discount or cost factor, which together remained as a contingent liability of the petitioner to Phillips, since under the basic agreement petitioner guaranteed payment by subscriber as long as subscriber's obligations remained unpaid. As each subscriber made its annual payment to Phillips, petitioner would charge off such portion of the contingent liability as was erased

by subscriber's payment, and the aliquot part of the discount or cost factor was charged to profit and loss as an expense for the then current year.

The 7 per cent per payment was not identified on the books of the petitioner as a discount factor or as a loss from the sale and assignment of its subscribers' contracts, but such discount factor was included in petitioner's regular interest expense account.

The pertinent provisions of the Internal Revenue Code are set forth in the margin.[1]

The petitioner elected to compute its excess profits tax credit under the invested capital method.

The first contention of petitioner is that it had no "outstanding indebtedness" as of the beginning of any day in the year 1942, due Phillips, and that under the terms of the written agreement it could

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

(a) TAXABLE YEARS BEGINNING AFTER DECEMBER 31, 1939.—The excess profits net income for any taxable year beginning after December 31, 1939, shall be the normal-tax net income, as defined in section 13 (a) (2), for such year except that the following adjustments shall be made:

*　　　*　　　*　　　*　　　*　　　*　　　*

(2) EXCESS PROFITS CREDIT COMPUTED UNDER INVESTED CAPITAL CREDIT.—If the excess profits credit is computed under section 714, the adjustments shall be as follows:

*　　　*　　　*　　　*　　　*　　　*　　　*

(B) Interest.—The deduction for interest shall be reduced by an amount equal to 50 per centum of so much of such interest as represents interest on the indebtedness included in the daily amounts of borrowed capital (determined under section 719 (a));

SEC. 714. EXCESS PROFITS CREDIT—BASED ON INVESTED CAPITAL.

The excess profits credit, for any taxable year, computed under this section, shall be the amount shown in the following table:

If the invested capital for the taxable year, determined under section 715 is:

Not over $5,000,000 _____ 8% of the invested capital.

*　　　*　　　*　　　*　　　*　　　*　　　*

SEC. 715. DEFINITION OF INVESTED CAPITAL.

For the purposes of this subchapter the invested capital for any taxable year shall be the average invested capital for such year, determined under sction 716. * * *

SEC. 716. AVERAGE INVESTED CAPITAL.

The average invested capital for any taxable year shall be the aggregate of the daily invested capital for each day of such taxable year, divided by the number of days in such taxable year.

SEC. 717. DAILY INVESTED CAPITAL.

The daily invested capital for any day of the taxable year shall be the sum of the equity invested capital for such day plus the borrowed invested capital for such day determined under section 719.

SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust * * *.

*　　　*　　　*　　　*　　　*　　　*　　　*

(b) BORROWED INVESTED CAPITAL.—The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day.

not be indebted to that company until one or more of its customers or subscribers, whose contracts were "sold and assigned" defaulted in payment and such payment remained in default for a period of thirty days. Petitioner urges that, since no customer whose contract had been assigned to Phillips had defaulted in payment during the year under review, no outstanding indebtedness in connection with the agreement with Phillips had been created.

The respondent contends that, if the basic agreement between Phillips and petitioner and the actual assignment of the contracts are construed together, it is clear that the accounts were not in fact sold to or purchased by Phillips, but were assigned to Phillips solely for the purpose of securing the amount advanced to petitioner; that petitioner did not divest itself of all interest in the contracts, since the agreement provided for the reassignment thereof to petitioner when the amounts due Phillips had been paid; that the transactions between Phillips and petitioner thus in substance amounted to a mortgage of petitioner's contracts to secure Phillips' advances to petitioner, and, therefore, petitioner's indebtedness to Phillips must be considered "borrowed capital," since it was evidenced by a mortgage and thus qualifies under the definition contained in section 719 (a) (1), *supra.*

In support of his contention, the respondent cites and relies upon *Brewster Shirt Corporation* v. *Commissioner* (C. C. A., 2d Cir., 1947), 159 Fed. (2d) 227. In that case Brewster, in order to obtain sufficient capital for its business, entered into a written agreement with Mills Factors Corporation in which it agreed to assign as collateral security its accounts receivable to the factor and the latter agreed to advance 90 per cent of the face value of the accounts and to pay the balance, less a stipulated charge of $\frac{3}{4}$ of 1 per cent per month, upon payment of the assigned accounts. The agreement provided that "the Factor will purchase said accounts receivable subject to the terms and conditions * * * set forth, at their net face value, less trade discounts and commissions," and Brewster agreed to repurchase at face value accounts which were not paid at maturity and assumed all credit risks with regard to the accounts. The Circuit Court held that the amounts advanced to the petitioner constituted borrowed invested capital, on the ground that the indebtedness was evidenced by instruments which constituted a "mortgage," and, among other things, said:

It is clear that as soon as accounts were assigned and advances made thereon the agreement and assignments involved security transactions which in law constituted a mortgage. What legally is a mortgage is a matter of substance and not of mere form. * * *

* * * * * * *

* * * It made no difference that Article "First" of the agreement provided that the Factor should "purchase said accounts subject to the terms and conditions hereinafter set forth, at their net face value, less trade discounts and commissions" for the advances were in fact loans, the assigned accounts were

collateral security by the terms of the agreement, and repayment of the advances was guaranteed by the borrower. *Home Bond Co.* v. *McChesney*, 239 U. S. 568, 36 S. Ct. 170, 60 L. Ed. 444.

Petitioner attempts to distinguish the cited case from the instant proceeding and points to the provisions in the agreement in the *Brewster* case that the assignment and sale of the taxpayer's accounts receivable were made as "collateral security" for moneys advanced; that if at the termination of the agreement money was owed by Brewster to the factor, and Brewster did not pay it upon request, the factor might sell any collateral held by it at public sale, with ten days' notice to Brewster; and that Brewster was to continue to pay interest for "all additional time taken by its customers for the payment of their bills, provided such interest is not paid by customer."

These provisions do not require a different conclusion in the instant proceeding from that reached in the *Brewster* case. In both proceedings there was an assignment of accounts receivable to a factor as security for the payment of advances; payment of these accounts was guaranteed by the assignor; and in both agreements words were used indicating either a "purchase" of the accounts by the factor or a "sale" by the assignor. It is true that petitioner was not required to make any payment of interest where additional time was taken by its customers, but its assignments nevertheless "involved security transactions which in law constituted a mortgage" under the rationale of the decision of the Circuit Court of Appeals for the Second Circuit in the *Brewster* case. Following that decision, we hold that the indebtedness of the petitioner to Phillips constituted borrowed capital as defined in section 719 (a) (1), *supra*.

The petitioner cites and relies upon *Consolidated Goldacres Co.* v. *Commissioner* (C. C. A., 10th Cir.), 165 Fed. (2d) 542. In that case the Circuit Court held that a conditional sales contract obligating taxpayer to pay monthly installments contingent upon amount of ore milled at plant installed by a creditor on property of taxpayer was not a "mortgage" within provisions of the excess profits tax statute allowing credit in the amount of outstanding indebtedness evidenced by "mortgage." In the course of its opinion the court distinguished the facts before it from those in the *Brewster* proceeding.

Petitioner's second contention is that the "cost" or "discount" or "finance factor expense" charges incurred by it in connection with the assignment of its subscribers' contracts to Phillips were not interest charges, and that the aliquot portion of such charges written off by it in 1942, while being properly deductible as an expense under section 23 (b), was not interest so as to come within the purview of section 711 (a) (2) (B) of the code.

Section 711 (a) (2) (B) provides that if the excess profits credit is

computed under the invested capital method the deduction for interest shall be reduced by an amount equal to 50 per cent of so much of such interest as represents interest on the indebtedness included in the daily amounts of borrowed capital determined under section 719 (a).

As has been previously mentioned, when the petitioner assigned one of its contracts to Phillips, the latter did not advance to petitioner the full face value of the contract, but the face value (or such lesser amount as might have been agreed upon) less a discount factor of 1.35. Thus, if the petitioner assigned the contract of one of its subscribers providing for the payment of $1,000 a year for five years, Phillips would advance to the petitioner $3,703.70 ($5,000 divided by 1.35). The balance, $1,296.30, was the finance charge imposed by Phillips for financing the contract. This charge was equal to five times 7 per cent of $3,703.70, the amount advanced to petitioner.

The petitioner would enter on its books the amount received from Phillips, plus the finance charge, as a contingent liability to Phillips. The annual payment of $1,000 would be made by the subscriber direct to Phillips, and as each payment was made petitioner would reduce the contingent liability by the amount of the payment, at the same time charging off an aliquot part of the total finance charge as an interest expense for the year of payment. Thus, as each $1,000 payment was made, the petitioner would charge off as interest expense $259.26, or 7 per cent of the total amount originally advanced.

Petitioner's argument in support of its contention is that nowhere in the agreement between it and Phillips, or in the instruments of assignment, is there any mention of interest; and that while the "discount factor" or "finance cost" was an expense, properly deductible under section 23 (b) from gross income, it was merely the result of a bargain and sale transaction and similar to the cost or expense incurred in connection with the sale of a negotiable instrument or any other chattel.

The fact that the amount charged off as "interest expense" was not denominated interest in the agreement or assignments is immaterial if it was in fact an "amount which one has contracted to pay for the use of borrowed money" (*Old Colony Railroad Co.* v. *Commissioner*, 284 U. S. 552, 560) or "compensation for the use or forbearance of money." (*Deputy* v. *duPont*, 308 U. S. 488, 498.) Petitioner did not treat these amounts on its books as a cost or expense incurred in connection with the sale of a negotiable instrument or other chattel. It included them in its regular interest expense account, and we think properly so, because the record indicates they were amounts which it contracted to pay for the use of borrowed money. They were charged off ratably as its liability to Phillips was reduced. Our conclusion is that the respondent did not err in treating them as interest under

section 711 (a) (2) (B), for the purpose of adjusting normal tax net income by adding to it 50 per cent of the interest on borrowed capital.

The remaining contention of petitioner is that, as a matter of law and equity, it is not mandatory upon it to include for the purpose of determining its excess profits tax credit certain alleged indebtedness as borrowed invested capital within the purview of sections 717 and 719, if to do so, after giving effect to the alleged interest deduction applicable therein as provided in section 711 (a) (2) (B) of the code, would result in a penalty or minus excess profits credit.

This contention is unusual, for ordinarily the taxpayer is urging that borrowed capital is includible in invested capital and the Commissioner is contending that it is not. Cf. *Consolidated Goldacres Co.* v. *Commissioner, supra,* and *Brewster Shirt Corporation* v. *Commissioner, supra.* Petitioner does not want to include the liability to Phillips as part of its borrowed capital because, if it does, the only benefit it will receive will be the inclusion of 8 per cent of the amount of one-half of this borrowed capital in its excess profits credit, whereas under section 711 (a) (2) (B) it will have to restore to income interest charges in excess of that amount. The net result, therefore, of the inclusion of the Phillips indebtedness in invested capital will be that petitioner will have to pay a greater excess profits tax than it would pay if it is excluded.

The respondent contends that the petitioner, having elected to compute its excess profits tax credit on the invested capital basis, is required by sections 717 and 719 of the code to include all of its borrowed invested capital (50 per cent of its borrowed capital) in computing the amount of its invested capital. He argues that these sections do not provide that the borrowed invested capital *may* be included in the invested capital, but provide that it *shall* be included, and that the use of the word "shall" makes mandatory the inclusion of all borrowed invested capital. Respondent also points out that the reports of the Senate Finance Committee and the House Ways and Means Committee on the Second Revenue Act of 1940 nowhere indicate that the inclusion of borrowed capital was to be at the discretion of the taxpayer; that the House bill originally provided for the inclusion of a sliding percentage of borrowed capital in invested capital, but this provision was amended in the Senate so a straight 50 per cent of borrowed capital was to be included; and that, in commenting on the amendment, the Senate Finance Committee said:

Under the bill as reported by your committee *all borrowed capital,* as defined in the House bill, *is includible in invested capital* at 50 per cent. [Italics supplied.]

In support of its contention the petitioner urges that the use of the word "shall" in sections 717 and 719 does not make mandatory

the inclusion of all borrowed invested capital; that this word should be interpreted to mean "may"; that Congress was not thinking in terms of imposing additional hardship upon the taxpayer when it enacted these sections; and that if a corporate taxpayer which has elected to compute its excess profits tax on the invested capital method (either because it was not in existence in base years, or because it did not have any earnings during those years) is compelled to determine its excess profits tax credit by including in its borrowed invested capital all indebtedness, regardless of the rate of interest charged, the net result would be to impose upon such a taxpayer a special tax over and above that which Congress intended to impose.

"There are cases in which words of a statute, which are generally regarded as mandatory, are nevertheless given a directory or permissive meaning, in order to give effect to the legislative intent." 50 Am. Jur., sec. 32, p. 53. This is not such a case. In sections 714 to 719, inclusive, Congress has prescribed what is to be included in invested capital by a corporation electing to base its excess profits credit on invested capital. It has provided that the excess profits credit based on invested capital shall be the sum of the corporation's "equity invested capital" and its "borrowed invested capital" and it has defined both of these terms. The language used is mandatory and not permissive, and this Court is without authority to permit the exclusion of "borrowed invested capital," even though it may be, as petitioner urges, that Congress did not foresee that its inclusion might, as in the instant proceeding, result in a greater excess profits tax than would have resulted had it been excluded. "In sum we cannot sacrifice the 'plain, obvious and rational meaning' of the statute even for 'the exigency of a hard case.' " *Deputy* v. *du Pont*, 308 U. S. 488, 498. Cf. *Crossett Western Co.* v. *Commissioner*, 155 Fed. (2d) 433; certiorari denied, 329 U. S. 729. We have no alternative but to follow the statute, and we therefore hold that petitioner's "borrowed invested capital" as well as its "equity invested capital" must be included in determining its total invested capital.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

KERN, *J.*, dissenting: With all due deference to the majority of this Court, and to the Circuit Court of Appeals for the Second Circuit, I continue to believe that the transaction present in this case (and also the one present in the *Brewster Shirt Corporation* case) is one more analogous to the discount of accounts receivable than to securing, by way of collateral security or mortgage, accounts payable.

MURDOCK and DISNEY, *JJ.*, agree with this dissent.